

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-08-00133-CV

_____

IN THE INTEREST OF A.L.M. AND
S.M.M., MINOR CHILDREN

On Appeal from the 307th Judicial District Court
Gregg County, Texas
Trial Court Nos. 2007-2232-DR & 2008-721-DR

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Carter

O P I N I O N

K.M. and J.M. appeal the trial court's order terminating their parental rights to A.L.M. and S.M.M.  K.M. is the biological mother of B.L.S.,[1] A.L.M., and S.M.M.  J.M. is the biological father of sons A.L.M., age seven, and S.M.M., age one.

The sole basis for termination in this case is based on the trial court's findings of the elements of the rarely-utilized Section 161.003 of the Texas Family Code[2] which, generally, provides as a ground for termination a parent's mental illness or deficiency and the resulting inability to meet the child's mental, physical, and emotional needs.  *See* TEX. FAM. CODE ANN. § 161.003 (Vernon 2008).  The parents contend the evidence is legally and factually insufficient to satisfy the elements of Section 161.003 of the Texas Family Code because the Texas Department of Family and Protective Services (Department) did not prove by clear and convincing evidence that both K.M. and J.M. have a mental or emotional illness or mental deficiency that in all reasonable probability will render both of them unable to provide for both A.L.M.'s and S.M.M.'s physical, emotional, and mental needs until the eighteenth birthday of each child.  We agree.

---

[1]K.M. signed an affidavit of relinquishment of her parental rights to B.L.S. to facilitate the adoption of B.L.S. by one of K.M.'s sisters, not the one living with the accused abuser.  The parents concede that the termination of parental rights to B.L.S. is not at issue.  She will be discussed only as she relates to the initial removal of and termination of rights to the other children.

[2]Section 161.003 of the Texas Family Code has some distinct elements, including timing elements, not found in the more commonly-used grounds of Section 161.001 of the Texas Family Code.  *See* TEX. FAM. CODE ANN. § 161.001 (Vernon Supp. 2009).

# I. FACTUAL AND PROCEDURAL BACKGROUND

## A. Leading up to Removal of Two Older Children

In 2000, the oldest daughter, B.L.S., began making outcries of sexual abuse by Berry Robertson. Robertson is the common-law husband of K.M.'s sister Sonna and is also second cousin to K.M. and Sonna. The Department ultimately ruled out these allegations. She again made outcries in 2001 which the Department gave a "reason to believe" designation, but eventually dismissed. In 2007, B.L.S. again made outcries of sexual abuse by Robertson. At some later date, the family lived with or near J.M.'s father, Reuben de la Rosa, a convicted sex offender. As a result, in October 2007, the Department removed B.L.S. and A.L.M. and filed a petition for termination of parental rights on four grounds under Section 161.001 of the Texas Family Code.[3]

## B. A New Child and New Allegations

During the pendency of that suit, K.M. gave birth to another son, S.M.M., in January 2008. Three months after his birth, the Department removed S.M.M. and filed a petition for termination of parental rights in a new and separate cause number (2008-721-DR), seeking termination on the same four grounds as were sought in the case involving B.L.S. and A.L.M. On September 18, 2008, the Department amended its petition as to all three children and referencing one cause number (2007-2232-DR), to add the ground for termination under Section 161.003 of the Texas Family Code. The

---

[3]The Department sought termination as to the children based on Sections 161.001(1)(D), (E), (N), and (O). Those grounds, generally, involve dangerous conditions, dangerous conduct, constructive abandonments, and failure to comply with a court order, respectively.

hearing was held, at the end of which the Department affirmatively abandoned its allegations of constructive abandonment.

## C.    The Trial Court's Ruling

A trial to the bench on September 29–30, 2008, resulted in termination of parental rights as to B.L.S. based on an affidavit of relinquishment and termination and as to A.L.M. and S.M.M. based only on the mental illness/deficiency ground under Section 161.003 of the Texas Family Code. The trial court explained it did *not* find that K.M. and J.M. knowingly put the children in dangerous conditions.   The trial court did not orally find that J.M. failed to pay ordered child support, but the

final order included that finding.[4]  The trial court signed its consolidated[5] final order November 20, 2008.

The parents filed a statement of points on appeal November 3.  *See* TEX. FAM. CODE ANN. § 263.405(b) (Vernon 2008).  At the Section 263.405 hearing, the trial court found that appellant parents' appeal would not be frivolous and that they were indigent and, thus, entitled to a free record and an appointed attorney for appeal.  K.M. and J.M. filed their notice of appeal November 10, 2008, and their amended notice of appeal November 24, 2008.  TEX. FAM. CODE ANN. § 263.405(d), (e) (Vernon 2008).  The parents appeal the order as to A.L.M. and S.M.M., but not as to B.L.S.

---

[4]Before a final order was signed, the attorneys and trial court realized that trial in regard to S.M.M. started before the Department had been his managing conservator for six months, although it did begin 181 (trial court says 182) days after the Department had filed its *original* petition as to S.M.M. (on April 1, 2008).  TEX. FAM. CODE ANN. § 161.003(a)(3), (c).  In an attempt to cure the error, on October 21, 2008, the trial court granted a new trial as to S.M.M., took judicial notice of the testimony from the September 29–30 trial, then entered an order only as to S.M.M. and another order as to the two older children.  All parties appeared at that hearing and re-urged the evidence presented three weeks earlier at the hearing.  On the record, the trial judge stated she had found earlier that J.M. had not paid child support as ordered. The trial court's ruling does not confirm that statement.

[5]Pursuant to the parents' motion to reform the order of termination and to combine the separate orders as to S.M.M. and as to B.L.S. and A.L.M. for purposes of appeal, the trial court reformed those two final orders into one final order November 20, 2008.
The trial court had earlier signed an order of consolidation November 7, 2008, to make clear the two causes were combined.  No written order consolidating the causes before trial appears in the clerk's record, but the trial court makes reference in its written order to its June 11 oral declaration that the two causes were to be consolidated.  The docket sheet for the S.M.M. cause states it was consolidated with the B.L.S. and A.L.M. cause, but no consolidation order was signed before trial.

5

## II. APPLICABLE LAW

### A. The Family Code

Section 161.003 provides as follows.

(a)     The court may order termination of the parent-child relationship in a suit filed by the Department of Protective and Regulatory Services if the court finds that:

> (1)  the parent has a mental or emotional illness or a mental deficiency that renders the parent unable to provide for the physical, emotional, and mental needs of the child;
>
> (2) the illness or deficiency, in all reasonable probability, proved by clear and convincing evidence, will continue to render the parent unable to provide for the child's needs until the 18th birthday of the child;
>
> (3) the department has been the temporary or sole managing conservator of the child of the parent for at least six months preceding the date of the hearing on the termination held in accordance with Subsection (c);
>
> (4)  the department has made reasonable efforts to return the child to the parent; and
>
> (5)  the termination is in the best interest of the child.

(b)     Immediately after the filing of a suit under this section, the court shall appoint an attorney ad litem to represent the interests of the parent against whom the suit is brought.

(c)     A hearing on the termination may not be held earlier than 180 days after the date on which the suit was filed.

(d)     An attorney appointed under Subsection (b) shall represent the parent for the duration of the suit unless the parent, with the permission of the court, retains another attorney.

TEX. FAM. CODE ANN. § 161.003.

**B.    Standard of Review**

In a termination of parental rights appeal, legal and factual insufficiency points require a heightened standard of review. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).  In reviewing the legal sufficiency, we view all the evidence in a light most favorable to the finding to determine whether a trier of fact could reasonably have formed a firm belief or conviction about the truth of the State's allegations.  *J.F.C.*, 96 S.W.3d at 266; *In re T.H.*, 131 S.W.3d 598, 602 (Tex. App.—Texarkana 2004, pet. denied).  In reviewing the factual sufficiency of the evidence, we must ask whether the evidence is such that a finder of fact could reasonably form a firm belief or conviction about the truth of the State's allegations.  *C.H.*, 89 S.W.3d at 25.

**C.    Cases Addressing and Affirming Termination Under Section 161.003**

If not all, then the vast majority of cases addressing Section 161.003 have affirmed the trial court's judgment terminating parental rights.[6]  To illustrate the evidence necessary to affirm, we will discuss some of those cases.

In *Liu v. Department of Family and Protective Services*, 273 S.W.3d 785 (Tex. App—Houston [1st Dist.] 2008, no pet.), the mother suffered from schizophrenia and repeatedly refused to take medicine.  She was hospitalized several times and repeatedly engaged in

---

[6]The Fort Worth court suggested that the evidence in *In re J.P.*, No. 02-07-00026-CV, 2008 Tex. App. LEXIS 773 (Tex. App.—Fort Worth Feb. 4, 2008, no pet.) (mem. op.), would have been insufficient.  However, as the court noted, the Department did not allege Section 161.003 as grounds for termination in that case.

inappropriate and even violent behavior, from dancing nude through the house to attacking a grocery clerk. *Id.* at 787, 792–93. She was reported as not changing her child's diaper properly; provision of food was unknown. *Id.* at 787. She threatened to shoot Department employees and reported hearing female voices telling her negative things. *Id.* at 793. The court concluded that the evidence showed she could not properly care for her child without taking medication, which she refused to do and, as a result, had a history of hospitalization and demonstrated inappropriate, dangerous behavior. *Id.* at 794.

In *Rodriguez v. Texas Department of Family and Protective Services*, No. 03-05-00321-CV, 2006 Tex. App. LEXIS 4338 (Tex. App.—Austin May 19, 2006, no pet.) (mem. op.), the mother challenged the factual sufficiency of the evidence that established that the mother had mild mental retardation and dependent personality disorder. She suffered from seizures as well. *Id.* at *8. The dependent personality disorder prevented her from functioning as an independent adult. *Id.* at *9–10. Her child suffered from seizure disorder, brain encephalopathy, developmental delays, reflux disorder, and reactive airway disease. *Id.* at *3. As a result, the child had to regularly visit a neurologist, pediatrician, gastroenterologist, and ENT doctor. *Id.* Care for the "medically fragile" child called for "strict seizure precautions," extensive and careful supervision, and medication administration. *Id.* at *4, *19. The evidence showed the mother's low IQ and dependent personality disorder prevented her from responding to the child's significant medical needs. *Id.* at *11, *13–14. The mother's repeated failures to take her own medication reflected negatively on her ability to meet

8

the child's medical needs. *Id.* at *12. She had limited ability to understand the child's medical needs and limited ability to make independent decisions as to those needs. *Id.* at *10.

In *Morales v. Texas Department of Family and Protective Services*, No. 03-04-00003-CV, 2004 Tex. App. LEXIS 8752 (Tex. App.—Austin Sept. 30, 2004, no pet.) (mem. op.), a mildly mentally retarded father challenged the factual sufficiency of the evidence. He suffered from short-term memory loss, seizures, and impaired vision resulting from a brain injury sustained in a car accident. *Id.* at *4. He also suffered from high blood pressure, diabetes, and dormant hepatitis C, and he could not work or drive, and had extreme difficulty reading. *Id.* No personality disorder was diagnosed, but the psychologist testified that he had antisocial and narcissistic tendencies. *Id.* at *5. The child's prenatal drug addiction resulted in grand mal seizures, insomnia, and chronic reflux. The child also had cerebral palsy, asthma, and delayed speech development. *Id.* at *2. Medical care included one doctor's appointment per week, therapy twice a week, breathing treatments and multiple medications twice a day, and "around the clock" care. *Id.* at *2–3. The father's low intellectual functioning and personality traits prevented him from understanding or dealing with the child's extensive medical needs; his deficiencies impaired his judgment and decision making. *Id.* at *13.

The court reviewed the legal and factual sufficiency that showed the mother was mentally retarded and had a major depressive disorder with psychotic features. *In re C.L.*, No. 04-03-00638-CV, 2004 Tex. App. LEXIS 488, at *5 (Tex. App.—San Antonio Jan. 21, 2004, no pet.) (mem. op.). She functioned as a pre-teen in her daily life and would do so for the rest of her life; she was not

capable of meeting her children's needs. *Id.* at *5–6. For her to do so would require more help than was available. *Id.* at *6.

A chronically depressed and mentally retarded mother challenged the factual sufficiency of the evidence that showed that she harbored feelings of inadequacy and had a limited capacity to engage in higher level processing and decision making. *In re C.M.*, No. 01-98-00493-CV, 1999 Tex. App. LEXIS 4006 (Tex. App.—Houston [1st Dist.] May 27, 1999, no pet.) (published in part).[7] Her reading level caused concerns regarding her ability to administer medicine and maintain a safe home. *Id.* at *10. The evidence also showed the mother had a history of alcohol and drug abuse, neglectful supervision, and abusive relationships; the children were abused by the mother's partner in these abusive relationships. *Id.* at *8–9, *11, *13–14. The evidence also showed her noncompliance with most aspects of the service plan. She could not remember the grades of the children, the names of their schools, or the names of the people who cared for one of the children. *Id.* at *13. The children had special intellectual and emotional needs and had mild mental retardation. *Id.* The psychologist testified that the mother could not provide appropriate parenting for the children to overcome their intellectual and emotional deficits. *Id.*

In *Salas v. Texas Department of Family and Protective Services*, 71 S.W.3d 783 (Tex. App.—El Paso 2002, no pet.), a mentally retarded mother challenged the sufficiency of the evidence that showed that she was currently in long-term state care and diagnosed with impulse control

---

[7]Published portion found at *In re C.M.*, 996 S.W.2d 269 (Tex. App.—Houston [1st Dist.] 1999, no pet.).

disorder which manifested itself in inappropriate and indiscriminate sexual activity (hypersexuality).[8] She was in structured supervision and had to be accompanied by a staff member at all times. *Id.* at 786. She was doing poorly in state care, having run away several times, engaging in aggressive acts toward other patients, and making very little progress. *Id.* In fact, there was testimony that she had actually regressed. *Id.* at 787. The caseworker testified that the mother was unable to care for herself, hold a job, or provide a safe home for the children. *Id.* at 786.

A trend does seem to appear. When the evidence is less convincing of the parent's complete inability to parent, appellate courts are still willing to affirm termination on this ground when the evidence establishes special, extensive medical or emotional needs of the children. *See Rodriguez*, 2006 Tex. App. LEXIS 4338, at *3–5. Other cases make little or no mention of the specific needs of the child when evidence of the mental illness or deficiency make it clear that the parent is unable to meet the needs of a child without severe problems. *See Liu*, 273 S.W.3d at 787; *Salas*, 71 S.W.3d at 785–87. The needier the child, the more able the parent must be.

## III. SUFFICIENCY OF EVIDENCE OF MENTAL DEFICIENCY, INABILITY TO MEET NEEDS OF CHILD

Again, to support termination under Section 161.003, the Department must prove by clear and convincing evidence, inter alia, that the parent suffers from a mental illness or deficiency and that such mental illness or deficiency will, in all reasonable probability, render the parent unable to

---

[8]At the beginning of the Department's investigation, a worker visited the family home to find no food and inadequate sleeping arrangements. The children were hungry, thirsty, and unkempt, and one child had very bad tooth decay. *Id.* at 785.

provide for the child's needs until the child is eighteen years old. *See* TEX. FAM. CODE ANN. § 161.003(a)(1), (2). A sister court has characterized the elements of Section 161.003 as "more stringent" than the elements of Section 161.001. *See In re J.P.*, No. 02-07-00026-CV, 2008 Tex. App. LEXIS 773 (Tex. App.—Fort Worth Feb. 4, 2008, no pet.) (mem. op.).

### A. A Word on the Conjunctive

"Ordinarily the words 'and' and 'or,' are in no sense interchangeable terms, but, on the contrary, are used in the structure of language for purposes entirely variant, the former being strictly of a conjunctive, the latter, of a disjunctive, nature." *See Bd. of Ins. Comm'rs v. Guardian Life Ins. Co. of Tex.*, 142 Tex. 630, 180 S.W.2d 906, 908 (1944); *see also In re Brookshire Grocery Co.*, 250 S.W.3d 66, 69–70 (Tex. 2008); *Bayou Pipeline Corp. v. R.R. Comm'n*, 568 S.W.2d 122, 125 (Tex. 1978). With that, the State must prove that the parents are unable to meet the physical, mental, *and* emotional needs of the children. Realizing that often a child's needs are complex and may really touch on one or more of those needs, we do not propose that the State must set out examples of a parent's inability to meet each distinct need. What is clear is that the statute contemplates a global failure of the parent to meet the needs of the children.

We want to point out again that this case is ***not*** a case specifically involving endangerment under Section 161.001(1)(D) or (E). The Department did not prevail on an endangerment ground. Therefore, we are not looking to determine whether an act or omission of the parents endangered the physical or emotional well-being of the children. We are looking at the evidence that would show

the parents' inability to meet the mental, physical, and emotional needs of the children. With that distinction in mind, we turn now to the State's evidence to examine the legal and factual sufficiency of that evidence to so show.

### B. K.M.'s and J.M.'s Testimony

K.M. and J.M. married in 2001. K.M. testified that she graduated from high school and is currently living in a housing authority apartment. She detailed the family expenses. She testified that she plans to live in that apartment for the rest of her life and does not want to move any more. She testified that in addition to J.M.'s income, she has her own job mowing one large yard every two weeks and does some housecleaning jobs. She admits to having trouble remembering some things. However, in an attempt to remedy those difficulties, she maintains a folder with her important papers relating to programs and assistance she has received and sought. She brought the folder to show the trial court and explained that the folder is one way she stays organized and remembers things.

She testified that she and J.M. get helpful relationship counseling from their pastor. She also testified that the director of the housing authority has spoken to them about moving the family into a two-bedroom apartment should the boys return. She read the director's letter of recommendation into evidence.

She described the care she gave the children before their removal. She would take them to the playground and would always watch A.L.M. so that he would not fall and get hurt. She always kept them clean and well-clothed. She admitted to giving A.L.M. some sweets, especially when he

would ask for them in a store.  She testified that they took A.L.M. to church.  The family liked to go to the lake; she recalled that A.L.M. even caught some fish and wanted to keep them as pets, but the parents said no.  She recounted memories relating to A.L.M.'s last birthday, and said they had surprised him with cake, family members attending, and lots of presents.

When A.L.M. would get a sore throat, she would take him to a doctor, get him medicine, and make sure he took the medicine.  He only got sick a few times the year before going into foster care.  She took A.L.M. to a dentist in Longview when he was about four.  She felt bad because A.L.M.'s teeth were in bad condition, and there was really little to be done at that point.  The dentist recommended waiting to start the extensive work needed on his teeth until after school was out for the summer so that he would not have to miss a great deal of school.  She acknowledged that A.L.M. has had caps put on while in foster care and is not supposed to have sweets and admitted bringing him a package of gummy bears to a visit once, thinking that it would not hurt to have one package.

She took S.M.M. for a checkup with his pediatrician shortly after he got out of the hospital.  The doctor measured his head and his length and said that he was growing well and doing fine.  She took S.M.M. back to the doctor another time and does not know why the Department would be unable to find a record of that second visit.  She testified that she will get WIC and get the boys back on Medicaid if they are returned.

She spoke of her routine with A.L.M. at night.  He would get a bath after dinner and was able to dress himself.  She would then read books to him and sit beside him until he fell asleep.  He would

14

brush his teeth and liked to use deodorant, so she let him use hers. She would limit the amount of sweet drinks he could have, but kept apple juice and orange juice in the refrigerator thinking that it was natural and would not harm his teeth more.

K.M. testified that she was very sad that B.L.S. had to testify, and had asked her lawyer to get friends and family out of the courtroom for B.L.S.'s sake, to make it a little easier on her to testify about the sexual abuse issues. K.M. testified to the circumstances surrounding the time in which Sonna and Robertson stayed with them. She finally told them to leave because of the abuse accusations. Later, the family would live with them again under difficult financial circumstances and due to her once close bond with her sister Sonna, Robertson's common-law wife.

K.M. testified that she does not keep pornography around the house. When pressed to speculate as to how A.L.M. might have been exposed to pornography (which is speculative itself), K.M. guessed that Robertson might have such materials. She testified that she was relinquishing her rights to B.L.S. to make B.L.S. happy and believed that her sister (not the sister living with accused abuser Robertson) would be a good parent for B.L.S. She expressed her desire to get back her sons.

She testified that she has a support system in her friends, some family, and her church. She gets counseling and now has a stable home. Her health has gotten better; she has been exercising and has lost sixty-five pounds. She described her plans for taking care of the family and utilizing church as a resource and would agree to any Department monitoring of their home. She testified that they have stayed away from Robertson and de la Rosa and that she would never take her children

15

around them again. When pressed about the decision to live with Sonna and Robertson, she explained that their financial situation left them no choice. She has cut ties with much of her family due to the sexual and physical abuse issues going on and reiterated that she was not going to take her children back around those people. She repeated how helpful her pastor's counseling has been to the family.

J.M. testified that he does handyman and yard work. After the rent and bills are paid, they have "a little" money left over and that goes mostly to groceries. He testified to the several residences they have had over the years. He was raised by an aunt and uncle and did not meet his father, de la Rosa, until he was out of high school. His father told him that he went to jail for DWI. He admitted that after learning things connected to this case, the story was probably not right. At the time the family lived with de la Rosa, J.M. did not know of de la Rosa's sex offense conviction. After he learned the nature of the conviction, the family did not live with him again. He confirmed that there were no allegations that de la Rosa ever acted inappropriately with any of the children.

J.M. does have a few health problems and was scheduled to see a doctor. He admits they should have gotten a government-subsidized apartment sooner, rather than rely on certain family members with questionable moral compositions. He testified that he and A.L.M. would go fishing together and that A.L.M. liked to ride his bike and go to the park. He or someone from the church will have to be available to help K.M. since she does not drive. He, like K.M., agreed to any monitoring of the home if the boys were returned. He was optimistic about the family's future.

16

On cross-examination, the Department pointed out that he paid all of his court costs associated with an assault case, but was not able to pay child support. He clarified that they lived for short periods of time with Sonna and Robertson when the family needed a place to stay for a bit. He testified that he and K.M. always watched the children closely.

### C. Testimony from Department Workers and Foster Mother

#### 1. Summary

Wendy McMillan became the Department caseworker for this case in March 2008, after the original caseworker left the agency. She conceded that the parents completed their psychological evaluations and took parenting classes, maintained regular visits with the children, and obtained a safe, appropriate home. The parents failed to provide a copy of the children's immunization records, but did provide the required health, social, education, and genetic history packets. They went to counseling sessions with Donna Mason,[9] as required by the family service plan in place from approximately November 2007 to March 2008 when the family was assigned to Dr. Donald E. Winsted, III. K.M. and J.M. attended their evaluations and only about two more sessions with Winsted. She testified that drug abuse has never been an issue with this family.

She described the family's weekly supervised visitation. Though they attended regularly, according to McMillan, K.M. and J.M. demonstrated a "complete lack of parenting skills." As an

___

[9]Mason discontinued counseling services because she became concerned about S.M.M. still being in the home at that time and requested that the family be directed to another counselor. Mason wrote a letter about the safety of S.M.M. and her concerns about that. Her position was yet another reason the Department sought removal of S.M.M.

example of this complete lack of parenting skills, McMillan reports an instance in which K.M. asked one of McMillan's co-workers if five-month-old S.M.M. could have a sip of pineapple juice, what McMillan characterized as "a big red flag." She went on to explain that a mother of three would usually know that children are usually given only formula until about six months of age, not five months of age. Further, any juice should have been a baby food brand with reduced sugar. K.M. also did not hold S.M.M.'s bottle properly and had to be "redirected" on that issue. The parents also brought A.L.M. candy even though they were asked not to due to the state of his teeth at the time.

McMillan noted that J.M. took more of an observation role during the visitations, but would get on the floor to play or color with A.L.M. when A.L.M. asked him to do so. She also noted that television was a "big part" of the visit; the family just sat and watched television without much interaction. A.L.M., who McMillan described as pretty needy, would constantly seek attention and jump around a good deal and was ignored in large part.

McMillan testified that she believed that the parents did not understand the needs of the children or how to meet those needs. For instance, she noticed that when the parents would come to visit, they would always have cigarettes, but refused to buy A.L.M. a kid's meal at a fast food restaurant. She also described an incident in which K.M. wanted to continue to watch a video of a child's show starring a purple dinosaur when A.L.M. asked to change the video; since K.M. wanted to continue to watch the purple dinosaur show when A.L.M. did not, McMillan saw this as an example of K.M. putting her own needs before those of A.L.M.

18

McMillan confirms that as far as she is aware, no family member is living with Robertson. The children are doing well in their foster placements. She testified to S.M.M.'s physical condition when he came into Department care. He had cradle cap and a low head circumference which she attributed to lying in a flat position. He had a nonresponsive affect; he did not cry a lot like most babies. In foster care, his head condition has improved, he has gained weight, and is more responsive, appearing happy and playful. He still has some developmental delays, but, according to McMillan, he is moving toward his goals at a much faster pace. A.L.M. continues to have some sexually inappropriate behaviors. She testified about the relinquishment of rights to B.L.S., maintaining that the parents are unable to provide B.L.S. with a safe environment. Finally, McMillan did agree that there was never an issue noted regarding any concern with housekeeping; houses were always sufficiently clean and well-stocked.

Christa Leeman, S.M.M.'s foster mother, testified that S.M.M. smelled bad and needed clean clothes when he came into her care. She described his cradle cap and head circumference issues. She also went into his developmental delays. She described the steps she is taking to improve his head circumference problem and developmental delays, including taking S.M.M. to an early childhood coordinator once a month and an occupational therapist once a month and following their advice: exercising and playing with him every day and continuing his medical care. The exercises help him practice his gross and fine motor skills.

Timika Wesley is the case manager for East Texas Child Advocates and acted as guardian ad litem. She has never gone to the parents' house, but is familiar with all the information generated in the case. She provided her impressions of their parenting ability: "I've observed the mental instability of the parents. It was – I feel as though they needed a little more understanding, a little, you know, help in talking to them about the case and my role in the case, things of that sort." She commented on what she thought were inappropriate gifts. For instance, she pointed out that K.M. once brought A.L.M. a potholder. K.M. would later explain that it was probably given to A.L.M. to give to his foster mother. She did not believe the parents could meet the needs of the children, but did not detail those needs or the inability to meet those needs. She observed the parents playing and interacting with A.L.M. during visitation and agreed A.L.M. was bonded with his parents.

Beverly Tullar is the CPS supervisor in the conservatorship unit. She did not agree with the decision to allow K.M.'s parents to be caretakers for S.M.M. She noted that the Department's homemaker has provided one-on-one services with the parents and commented on the several residences they have had over the course of the years and the investigation. She maintained that although the parents had made living arrangements with other family members or through a shelter at church, only within the last month have the parents gotten a suitable place of their own, the apartment. (This runs contrary to the recommendations made by the Department after S.M.M.'s birth, directing the parents to obtain larger housing and allowing K.M.'s parents to act as caregivers.) Tullar characterized the parents as "resistant to participate in services," although the record suggests

20

that K.M. and J.M. complied with the majority of the instructions provided in the family service plans. She testified to the first counselor's refusal to continue counseling upon the discovery that S.M.M. remained in their care and the parents' failure to follow through with more counseling sessions with Winsted.

Speaking generally, Tullar explained that the Department has specified A.L.M.'s needs and that the parents have not demonstrated that they can meet those needs. She did not provide those "specified" needs. She testified that the facts that S.M.M. already had developmental delays and had cradle cap demonstrate that the parents were not providing sufficient medical care. The parents did not take advantage of the support group they had through church. She expressed some sympathy for them and just thinks they cannot serve as adequate parents.

### 2. Evaluating this Evidence

There have been no allegations of drug use. There is no evidence that the children have had insufficient food available. According to all reports, food and formula have always been adequate. K.M. testified that she kept A.L.M. clean and well-dressed. There is evidence from the foster mother that S.M.M. smelled bad and needed clean clothing upon his arrival.

A.L.M.'s dental problems may go to specific medical needs. However, there is evidence from K.M. that she took A.L.M. to the dentist. According to K.M., the dentist directed that A.L.M. return for care after school was out for summer so that he would not miss a great deal of school for the extensive work that would need to be done. K.M. testified that she limited his access to sweet drinks

21

but did admit that she kept juices available in the refrigerator. She did bring him gummy bears to a visitation; she thought one package would not be that bad.

Regarding S.M.M., there is evidence that he had cradle cap, a condition the foster mother was able to remedy by washing and scrubbing his head. There is no evidence as to how common or dangerous this condition is or whether the parents could have taken some action to avoid it or took some action to cause it—just evidence that he had it and that the foster mother remedied it with relative ease. S.M.M.'s foster mother testified that he was diagnosed with developmental delays. K.M. testified that she took him for his first checkup and that everything checked out okay. So there is some conflicting evidence on the existence of those delays. Also missing from the record is any evidence that the parents would be unable to meet S.M.M.'s need with respect to working on the developmental delays. According to the foster mother, she has to go to monthly doctor's appointments and perform daily play and exercises with him. By most accounts, perhaps all except McMillan's, K.M. was an attentive and playful mother. McMillan's testimony even shows that J.M. has played some with A.L.M., suggesting he could do the same with S.M.M. So, no evidence shows that the foster mother is required to play with or exercise S.M.M. in a manner of which K.M. and J.M. are incapable. There is also no evidence that the parents would not be able to take S.M.M. for medical care. In the few months that he was in their care, K.M. took him to at least one doctor's appointment and, perhaps, two appointments, according to K.M.

The testimony from those associated with the Department fails to establish by clear and convincing evidence that K.M. and J.M. were, as a result of their mental deficiencies, unable to meet the mental, physical, and emotional needs of their sons. Many of the examples of the "complete lack of parenting skills" are, in fact, hypercritical observations of the parents and fail to meet the heightened standard of proof necessary for termination.

## D.    Dr. Winsted's Testimony Concerning Parenting

Dr. Winsted is the psychologist who performed psychological evaluations of A.L.M.,[10] K.M., and J.M.  He explained his purpose in conducting these evaluations:  "to determine if parents have issues that could impede their parenting and then what kind of services they need to work on those issues."

### 1.    Evaluation of K.M.

According to Winsted, K.M. was "functioning on what we call the mentally deficient range of intelligence."  He characterized this as "potentially an issue."  In the evaluation, K.M. acknowledged neuropsychological dysfunction.  That is, she explained that she had difficulty concentrating, difficulty in forming thoughts, and had chronic headaches.

"At that time," K.M. was having "emotional stress and problems."  She displayed "anxiety, depression, and post-traumatic symptoms" and "some thought confusion."  Winsted also testified that

---

[10]Winsted first detailed his observations following his evaluation of A.L.M., explaining that A.L.M. may have emotional or behavioral problems as suggested by some gender identity confusion and sexual acting out.  He later conceded that A.L.M.'s elevated behavioral and emotional issues could have been caused or exacerbated by removal from his parents.

23

"at that time," K.M. suffered from "low ego strength" or "low self-esteem" and had "a lot of unhappiness and personal distress." Later, he would acknowledge on cross-examination that certain emotional features or "distress" could have been caused by the fact that A.L.M. had fairly recently been removed from the home. Winsted went on to testify that "at that time," K.M. also showed some antisocial, avoidant, dependent, obsessive-compulsive, paranoid, schizoid, and schizotypal personality traits. She also displayed self-defeating, depression, and passive aggressive features.

When asked to explain the significance of the above-listed personality findings, Winsted testified, "If they're clinically significant, then that would suggest that this person probably has difficulty relating to others in a lot of different areas and with a lot of different people." Her "ability to relate effectively to others consistently is likely to be impaired with these types of personality issues." He does explain, however, that personality issues can be modified or improved. But they are difficult to change. Mental deficiency, on the other hand, is generally set at K.M.'s age and would not likely change. He testified that her mentally deficient functioning level would remain so until each child reached the age of eighteen.

Winsted testified that K.M. would be able to meet some of A.L.M.'s needs, "but there are some important needs that [A.L.M.] has that [K.M.] *may have difficulty meeting*." (Emphasis added.) For instance, K.M. can meet some of A.L.M.'s basic physical needs such as adequate food, clothing, etc., and could encourage him to do well in school. He went on to explain, though, that it would be hard for K.M. to help her son with homework and such. According to Winsted, K.M.

24

would "struggle" most with A.L.M.'s emotional and behavioral issues, such as any issues arising from any sexual abuse. He goes on to explain that there could be issues K.M. needs to work on herself in order to be able to provide A.L.M. "a healing environment" for his emotional and behavioral issues. K.M.'s own healing/coping would require "long-term intervention."

"At that time" K.M. displayed characteristics like parents who physically abuse their children. Winsted is careful to interject that his observations do not mean that she has abused her children, only that she shares some characteristics with that type of parent. He testified that those characteristics could suggest a "a greater risk" of that behavioral pattern. Some of her parenting attitudes were "good," some were "okay," and still others would need to be modified.

K.M.'s issues surrounding her physical abuse would need to be addressed. "At that time," K.M. said she was having difficulty controlling "angry impulses" and had trust issues.[11] He also testified that she had "pretty significant mood swings" "at that time." All of these characteristics, he testified, would make it difficult for K.M. to deal with or relate to other people. Her problems lie not only in her deficient cognitive function, but also in her emotional and personality functioning; the combination leads to her problems.

### 2.      Evaluation of J.M.

Winsted described J.M. as friendly and cooperative, although he did come across as "defensive" in response to some questions. When patients take a defensive posture, explained

---

[11]Winsted interjected that it was understandable, under the circumstances, for K.M. to have trust issues.

Winsted, that makes it "hard to know for sure what their issues are." He testified that J.M. was also mentally deficient. His nonverbal IQ was borderline, though, leading him to agree that J.M. would likely be better able to negotiate his environment than K.M.

When asked if he found any personality disorders, Winsted cited that J.M. found it hard to make friends, hard to trust others, maintained that he could not count on many people, and did not have many close friends. J.M. "manifested what we call sadistic features" on one of the evaluation tools. He explained that people with such features often enjoy watching movies in which others suffer and may enjoy such in real life. Later, he would explain that the Department took this observation out of context when it used that finding as a basis to remove S.M.M. J.M. described himself to Winsted as apathetic. Further, Winsted observed that from J.M.'s perspective, he has a lot of problems with his children or raising children with lots of problems. As a result, he is likely to see his children in a "negative light."

Winsted testified that it was *difficult to conclude* whether J.M. would be able to meet A.L.M.'s emotional needs. He could not determine whether J.M. was defensive at the evaluation because "the stakes were very high" or whether that was his general nature. If it is his general nature to be defensive, then it would be difficult for J.M. to meet A.L.M.'s emotional needs. J.M. "could probably provide for [the] physical [needs]" of the children. Winsted testified he "would question the emotional and mental [needs], though, explaining that those needs would be "a challenge for him as well."

26

### 3.     Dr. Winsted's Conclusions Regarding Parenting

On cross-examination, Winsted testified that these psychological evaluations provide a snapshot of the patient in terms of "emotional" observations, pointing out that cognitive and personality observations are more fixed. He testified that with six to nine months of service, a patient's intellect would not vary. There can "certainly be some improvements" in personality functioning, however. It would take most patients, including K.M. and J.M., a couple of years for significant change to occur. Winsted testified that it is in the area of emotional function where the most improvement may be seen in the shortest period of time; depression and anxiety can improve significantly in a matter of months with cognitive behavior therapy.

Importantly, following his evaluations, Winsted concluded that K.M. and J.M. *could* parent S.M.M. as long as S.M.M. did not have any "significant medical problems."

> [P]eople that have that [cognitive] function and that level do tend to have some struggles or difficulties with raising children and generally do need some kind of extra help.
>
> . . . .
>
> The other thing I'd like to say though is the issues, especially with [K.M.], that she's struggling with [are] probably going to require in addition to [help from church members], which is very important to have a good support community, [are] going to require some professional therapeutic intervention as well.

### 4. Evaluating this Evidence

Winsted's testimony is sufficient to show that K.M. and J.M. do suffer from a mental deficiency. However, it fails to establish by clear and convincing evidence that the parents are unable to meet the needs of the children. In fact, with respect to S.M.M., the doctor's testimony indicates that in his opinion, K.M. and J.M. *can* adequately parent him. With respect to A.L.M., the doctor's testimony suggests that certain aspects of parenting will be a challenge for the parents. Evidence that parenting may be difficult, though, falls short of forming a firm belief or conviction that K.M. and J.M. are unable to meet the needs of the children.

### E. Evidence of Exposure of Children to Alleged Sex Offender and Convicted Sex Offender

Testimony from K.M. and J.M. fails to meet the elevated standard of proof to support termination. Likewise, testimony from those associated with the Department and S.M.M.'s foster mother fails to establish by clear and convincing evidence that K.M. and J.M. are unable to meet the needs of the children. Finally, as we have just seen, Winsted explained that he believed that K.M. and J.M. are capable of parenting S.M.M., but may face some challenges meeting the needs of A.L.M. Again, recognizing that parenting in general is fraught with challenges, we conclude that testimony that certain aspects of parenting may be difficult for a parent is legally insufficient to support termination. We are left, then, with the task of evaluating the evidence that K.M. and J.M. exposed the children to the accused abuser of B.L.S. and to J.M.'s father, a convicted sex offender.

28

We note that the State relies a great deal on the parents' repeated reliance on family members, one who had been accused of sexually abusing the boy's older sister, B.L.S., and another being J.M.'s father, a registered sex offender.[12] We begin by noting that there is not the slightest evidence of abuse of *any* of the three children at the hands of J.M.'s father, de la Rosa. There is no evidence or allegation of Robertson's abuse of A.L.M., and there is no evidence that S.M.M. has ever had any contact whatsoever with Robertson. S.M.M. only lived with his mother and father for three months, and during that time, they were living with the maternal grandparents and later in their own apartment.

With that, we are left to evaluate evidence of the parents' exposure, several times over a number of years, of the oldest child (again, whose relationship is not at issue) to her accused abuser. We neither minimize the impact such exposure may have had on the oldest child, nor do we suggest that such exposure would not have an impact on a younger sibling. Again, we point out that this is not a case in which we focus on endangerment under Section 161.001 in which exposure of B.L.S. to abuse may serve as evidence that the parents endangered the younger children. *See In re A.S.*, 261 S.W.3d 76, 88 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); *In re K.A.S.*, 131 S.W.3d 215,

---

[12]The Department seems to emphasize the parents' decision to live with Robertson and with de la Rosa, characterizing them both as sexual predators. It is important to note that J.M. did not grow up around his father and was told that he went to jail for DWI when, in fact, it appears that he was incarcerated after being convicted of sexual abuse of a daughter. J.M. found this out during the Department's investigation, and, after he learned of the sex offense conviction, the family did not live with de la Rosa again. So, it appears the family did not know of de la Rosa's sexual abuse history. Moreover, there is no evidence that de la Rosa abused or attempted any abuse as to any of the children at issue here. S.M.M. never lived with de la Rosa.

222 (Tex. App.—Fort Worth 2004, pet. denied). In the endangerment cases, the decision to terminate the parent-child relationship does not require that the endangering conduct be directed toward the child, but it does require that it be committed in the presence of the child. *A.S.*, 261 S.W.3d at 88.

Here, we must look at the parents' overall failure to provide for the needs of the children at issue.

In affirming termination under Section 161.003, the *Salas* court mentioned that along with a wealth of other supporting evidence, the mother was unable to prevent the sexual and physical abuse of her children. *See Salas*, 71 S.W.3d at 790. So, while we recognize that prevention of abuse may be a consideration here, with respect to A.L.M. and S.M.M., we have no evidence that the parents failed to prevent abuse. S.M.M. was born January 11, 2008, and the Department removed him from the home less than three months later. So the record shows S.M.M. was not born when the family lived with or near any abuser or offender. Nothing in the record suggests that A.L.M. or S.M.M. experienced sexual or physical abuse. There was no evidence in the instant case, or even any allegation, that A.L.M. or S.M.M. experienced any abuse.

Section 161.003 of the Texas Family Code requires more than a finding of mental deficiency. That is, we are called on to decide by clear and convincing evidence that because the parents were mentally deficient, they were unable to prevent exposing their oldest child to the family member she accused of sexually abusing her and that such evidence supports a finding that the parents are now

30

rendered unable to provide for the physical, emotional, and mental needs of the children. This is a difficult matter to prove since it first requires proof that the exposure to sexual abuse of the older child was not mere negligence, inattention, or poor parenting, but that it happened because the parents were mentally deficient. Upon making that linkage, there must also be evidence to support a determination that the parents' mental deficiencies exclude them from now and in the future providing for their children. It is theoretically possible that a parent's mental deficiency might indirectly cause abuse of a child—generally expert testimony is presented to make that connection. *M.F.G. v. Dep't of Children & Families*, 723 So. 2d 290, 292 (Fla. Dist. Ct. App. 3d Dist. 1998) (based on expert testimony and D.H.G.'s own incoherent responses, trial court found by clear and convincing evidence D.H.G. suffered from severe and chronic mental disorder and that she was unable to provide reasonable care for her children); *In re N.F.*, 533 N.E.2d 952 (Ill. App. Ct. 2d Dist. 1989) (court relied on psychiatrist's testimony that mother could not independently parent her child). A primary reason for allowing an expert to give opinion testimony is to make a causal connection between the act or event and the resulting damage or injury. Causal connection must rest in reasonable probabilities; otherwise, the inference that such actually did occur can be no more than speculation and conjecture. *Ins. Co. of N. Am. v. Myers*, 411 S.W.2d 710, 713 (Tex. 1966). Here, Winsted's testimony, previously summarized, does not opine that the parents' mental deficiencies render the parents unable to provide for the physical, emotional, and mental needs of the children. In fact, in February 2008, after his psychological evaluation was completed, Winsted expressed the

31

opinion at a staff meeting that K.M. and J.M. could parent S.M.M.[13]  While we are not holding that

expert testimony is always essential in a termination case of this sort, the other evidence in this case

consists primarily of conclusory statements by lay witnesses.[14]

Here, there is some evidence that the parents were unsure whether the abuse ever happened,

especially initially when the Department's investigation suggested that it did not.  Further, even after

they began to believe the allegations, financial situations  "[l]eft them no choice but to rely on family

for shelter."   Certainly, we cannot say that financial difficulties are the equivalent of mental

---

[13]Winsted testified that his opinion was contingent on the parents' continued participation in services.  As described in a later footnote, the parents participated in the services offered.

[14]The other primary testimony was offered by McMillan, a caseworker whose testimony has been previously summarized.  McMillan testified about the service plan established with K.M. and J.M.  Generally, her testimony was that K.M. and J.M. complied with the plan. The testimony showed that the parents attended required parenting classes and had a safe and appropriate home. However, McMillan volunteered that a suitable house was not relevant because "if they can't protect their children, then there is no need to look at the house . . . in my opinion." Other parts of the plan completed were furnishing a health and social history of the children, and attending counseling.  In May 2008, the Department transferred the counseling to Winsted, and K.M. and J.M. attended sessions in June and August (this hearing was September 29, 2008).  McMillan was critical because they had not attended more counseling sessions.  Counseling was changed to Winsted because the previous counselor "did not want the liability" of leaving the infant S.M.M. with his parents.  This concern was one of the reasons S.M.M. was then removed.  Drug usage was never a problem, as verified by drug testing.  After S.M.M. was removed in March 2008, the goal of the Department was to see if the parents could demonstrate the ability to parent so the "children could be returned to them."  But McMillan said instead they showed a "complete lack of parenting skills."  Examples of this were the pineapple juice incident and having to redirect K.M. to hold a baby bottle correctly. Finally, she concluded they put themselves ahead of the children because they had cigarettes, but did not buy the children kiddy meals and because of the dispute about watching Barney on television. Needless to say, none of this evidence approaches the high standard of proof required to terminate the parental rights of the parents.

deficiency or that the record shows the parents' mental deficiencies were the direct cause of their financial difficulties.

There is no evidence that the parents continued to expose the oldest child to an environment in which her accused abuser was living because of their mental deficiencies. That is, nothing in the record would prove their mental deficiencies were the reason for their decision to bring B.L.S. into the household where Robertson was living. K.M. and J.M. admit that it was a mistake. It was an instance in which the parents did not meet the needs of their children, especially as to B.L.S. But there is no evidence that due to their mental deficiencies, they were *unable* to meet the needs of the children, only that with respect to this situation they failed to do so. Regarding A.L.M. and S.M.M., the evidence does not suggest that contact with Robertson, the alleged abuser, in any way compromised their need for safety and protection. No allegations were made that either son was abused. Further, there is no evidence the family had contact with Robertson after S.M.M. was born.

We find there is not sufficient evidence to allow a trier of fact to reasonably form a firm belief or conviction about the truth of the allegations concerning the termination of parental rights.

## IV.     CONSERVATORSHIP

The trial court also appointed the Department as the managing conservator of A.L.M. and S.M.M. The remaining question is whether that order continues to control independent of the termination decision or if the reversal of the termination order necessarily requires reversal of the conservatorship decree.

The Texas Supreme Court has spoken on this matter very recently. The first case addressed was *In re J.A.J.*, 243 S.W.3d 611 (Tex. 2007). In that case, an order terminating the parents' rights was reversed, and even though the parent did not raise an issue regarding the conservatorship appointment, the Texas court of appeals reversed the order appointing the Department as managing conservator. The Texas Supreme Court held that the Department had pled and the trial court had found a ground for the conservatorship order that was independent from the termination order and reversed the court of appeals.[15]

The next year, the Texas Supreme Court addressed another termination case, but in this instance, there was no independent ground for the appointment of a managing conservator. The appointment was made pursuant to Section 161.207 of the Texas Family Code, which requires the appointment of a managing conservator when a termination of parental rights is granted. Since there was no other ground for the conservatorship order, it was subsumed in the appeal of the parental rights termination order and reversal of the termination necessarily required reversal of the conservatorship award. *In re D.N.C.*, 252 S.W.3d 317, 319 (Tex. 2008).

In this case, the Department pled that it be named as the managing conservator "pursuant to Sections 153.005 and 263.404, Texas Family Code . . . ." Section 153.005 defines the parties authorized to be appointed as managing conservators ("a parent, a competent adult, an authorized

---

[15]The Texas Supreme Court held that the Department requested conservatorship based on Section 153.131(a) of the Texas Family Code. The trial court specifically found that the appointment of the parents would significantly impair the child's physical health or emotional development as required by this section.

agency, or a licensed child-placing agency"). Section 263.404 has been held to apply only when the trial court does not order termination of the parent-child relationship, and has no application when the parental rights have been terminated. *J.A.J.*, 243 S.W.3d at 615. Furthermore, the trial court, in appointing the Department as managing conservator, did not find any grounds for the conservatorship independent of the termination. Since the court terminated the parental rights, Section 263.404 did not apply and the court was required to appoint the managing conservator in accordance with Section 161.007, due to the termination. Here, like *D.N.C.*, the conservatorship issue was subsumed with the termination issue and there was no independent ground for conservatorship.[16] Consequently, the appointment of the Department as managing conservator is reversed.

The effect of our judgment will reverse the order of termination and therefore invokes another section of the Texas Family Code. When an order of termination is denied, the trial court is to "render any order in the best interest of the child." TEX. FAM. CODE ANN. § 161.205 (Vernon

---

[16]*In re A.S.*, 261 S.W.3d 76, 92 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd). In a case where the Department used precisely the same language as found here for the grounds for conservatorship ("pursuant to Sections 153.005 and 263.404") and also alleged Section 153.131 grounds (appointment of parent would significantly impair child's physical health or emotional development), but the trial court failed to make such findings, the Houston Fourteenth Court found the conservatorship order was based solely on the termination order and with its demise, the conservatorship order necessarily was reversed. Here, the Department did not allege Section 153.131 as grounds for conservatorship, and the trial court found none.

2008). An appellate court reviewing a matter months later is not equipped to know if circumstances of the parents or the children have changed since the trial court entered its order. Such a determination requires a fact-finder. Therefore, we remand the case to the trial court for the limited purpose of rendering an order, consistent with Section 161.205 of the Texas Family Code. *A.S.*, 261 S.W.3d at 93.

## V.     CONCLUSION

The record reveals that K.M. and J.M. may have made certain parental missteps, especially with respect to B.L.S. Assuming without deciding that those missteps could serve as a failure to meet the needs of the two younger children, we nonetheless conclude that none of those missteps is directly linked to the parents' mental deficiencies. That is, the evidence is not clear and convincing that as a result of their mental deficiencies, K.M. and J.M. are unable to meet the needs of the two younger children. We are mindful that the evidence must be clear and convincing to terminate parental rights, rights characterized as "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982); *see Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

Having concluded that the evidence is legally insufficient to support termination based on Section 161.003,[17] we reverse the trial court's judgment and render judgment denying the Department's petition seeking termination of K.M.'s and J.M.'s parental rights to A.L.M. and S.M.M. Further, for the reasons expressed, the appointment of the Department as managing conservator is reversed, and the case is remanded to the trial court to proceed pursuant to Section 161.205 of the Texas Family Code.


                                        Jack Carter
                                        Justice


Date Submitted:     August 5, 2009
Date Decided:       November 20, 2009

---

[17]The Department has requested that if the evidence is found to be legally insufficient, this Court modify the judgment to find termination on either Section 161.001(1)(D) or (E), relating to endangering conditions and endangering conduct, respectively. We may not grant such relief. *See In re J.R.S.*, 232 S.W.3d 278, 285 (Tex. App.—Fort Worth 2007, no pet.); *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 194 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).