# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00324-CV

---

**A. W., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 146TH DISTRICT COURT OF BELL COUNTY**
**NO. 318,020-B, THE HONORABLE CHRISTOPHER L. CORNISH, JUDGE PRESIDING**

---

## C O N C U R R I N G   A N D   D I S S E N T I N G   O P I N I O N

Simply put, the question before this Court is not whether Son and Daughter should return to Mother's household, but whether the Department met its burden to show that it is in Son's and Daughter's best interest to have no relationship with Mother at all. Based on the clear directives of the Supreme Court of the United States and the Supreme Court of Texas, and based on the evidence presented at trial, I cannot conclude that the Department met that burden. For the reasons set forth below, I would reverse the portion of the decree terminating Mother's parental rights and remand the case. And because they are not challenged on appeal, I would not reach the decree's provisions addressing conservatorship of the children or Father's rights. I therefore respectfully dissent in part from the majority's affirmance of the district court's final decree terminating Mother's rights to Son and Daughter.

## I. BACKGROUND[1]

In June of 2020, shortly after Daughter was born, the Department removed Son and Daughter from Mother and Father, who lived together and had been in a relationship for six years. At birth, Daughter's meconium tested positive for cocaine and cannabinoids, and Mother's urine showed traces of cannabinoids. Daughter showed symptoms of drug withdrawal, including tremors and seizures. Mother had previously relinquished her rights to three other children (Siblings[2]) around 2014, after the Department became involved due to reported drug use by Mother. The Siblings were adopted by their maternal grandparents. In addition, in 2016 the Department had investigated reports of Mother's alleged drug use during her pregnancy with Son and her alleged failure to seek adequate prenatal care during that pregnancy. Those reports were ultimately "ruled out" when Son tested negative for any substances at birth, and the case was closed when Mother completed her services.

At intake in 2020, the Department described Son as somewhat "overweight" and having "listening issues" but ultimately as being a "happy and sweet kid" who "get[s] along with his siblings and other kids his age." The Department described Daughter as being "a sweet and quiet baby." The Department reported that both children "appear[ed] to have a good positive relationship in the family" and that neither child displayed signs of developmental delay or behavioral issues. The Department described Mother and Father as having stable and appropriate housing, stable employment, and no history of domestic violence. Department research revealed that Mother had no criminal history but that Father had served fifty days for

---

[1] This section is taken from undisputed aspects of the record.

[2] Father offered undisputed testimony that he did not father the Siblings and that Son and Daughter are his only children.

possession of a prohibited weapon in 2009 and served four years for burglary of a habitation in 2014.

Following removal in 2020, Son and Daughter were initially placed with their maternal grandparents—the Siblings' adoptive parents—who wanted all five children to remain together. That placement failed when Grandfather "started contacting the Department asking for [Son] to be removed because he could not care for him." Grandfather also complained that it was too difficult for his household to support all five children. The Department then placed Son and Daughter together with an aunt. That placement was subsequently disrupted when a police report revealed that Aunt had left Son and Daughter unattended in a vehicle at a local grocery store.

After the second familial placement was disrupted and no other familial placement was identified, the Department placed Son and Daughter with a non-familial foster family. That placement failed when "[t]he foster mom could not handle [Son's] behaviors." In March of 2021, Son and Daughter were placed with a new foster family that intended to adopt the children. Son and Daughter remained there at the time of trial, although a month before trial the foster family contacted the Department and indicated that they had "changed their minds" and no longer wished to adopt the children. At trial, the Department indicated that its revised plan for the children would be temporary placement with an as-yet unidentified legal-risk foster home until an adoptive family could be found.

## II. TRIAL

The parties tried the case to the bench in May remotely in accordance with the emergency order in place at the time. *See Thirty-Sixth Emergency Order Regarding COVID-19*

3

*State of Disaster*, 629 S.W.3d 897, 897–98 (Tex. 2021) (order). Four witnesses testified at trial: Mother, Father, caseworker Jasmine Applin, and guardian ad litem Cathy Rothas.

### A. Applin

Applin testified first and briefly described the circumstances leading to removal and the history of the placements. When asked about the current placement, she responded:

> Overall[,] it's going well. There have been some issues with [Son] as far as, like, his behaviors; however, they do have him in therapy right now, he is in school and, you know, definitely trying to work with him in regards to, you know, his behaviors and getting him—or giving him that structure, home environment that he needs.

Applin described the children as "thriving" and having "come a long way" and noted that Father had agreed with that assessment. She then explained that the Department's "current permanency plan" for Son and Daughter is to "seek a legal[-]risk foster home" and ultimately arrange an "unrelated adoption." She conceded, however, that the Department had not "officially made a request for a legal[-]risk home" and had not "truly beg[u]n to search for a legal[-]risk foster home," notwithstanding the current foster family's stated unwillingness to continue as a long-term placement.

Applin then described Mother's and Father's family service plans, both of which were admitted into evidence. Mother's plan required her not to use any illegal or illicit drugs, to undertake a drug and alcohol assessment, to actively participate in counseling and parenting classes, to submit to weekly drug testing, to pay child support, and to maintain employment and a safe, clean, appropriate home. Father's plan required him not to participate in criminal activities, not to use any illegal or illicit drugs, to undertake a psychological evaluation, to

4

actively participate in counseling and parenting classes, to submit to weekly drug testing, to pay child support, and to maintain employment and a safe, clean, appropriate home.

When asked about compliance with the plans, Applin said that both Mother and Father had completed "outpatient rehab" and "were on the road to a monitored return" when they failed drug tests on February 8 and March 30, 2021, with both parents testing positive for cocaine metabolites.[3] She reported that Father was seeking additional outpatient therapy and that Mother had recently completed a thirty-day inpatient program. She testified that Father's tests had all come back negative since the positive test in March. She testified that she was uncertain about Mother's recent history because the Department did not seek or obtain any records from the inpatient facility but acknowledged that Mother had tested negative from March until her admission to that program. Counsel for Mother pressed Applin on this point:

Q. Have you been able to access any of the records from the rehab facility?

A. No, sir. Not yet.

. . .

Q. Okay. I understand. But if the judge terminates their rights today, there probably isn't much need for you to do that; is that what you're thinking?

A. Yes, sir.

Other than the drug-related provisions, Applin did not testify as to Mother's compliance with other requirements of the family service plan.

When asked whether she would support a monitored return, Applin responded with an unequivocal "no":

---

[3] Exhibits indicate that Mother tested negative 37 times during the pendency of the case.

Because both parents have known from the beginning the concerns of the Department, which has been the drug issue, especially for [Mother and Father]. Yes, the parents were completing their services, but drugs continue to be a problem, so, therefore, I cannot place two vulnerable children in their care knowing that if anything gets rough or something, they can possibly use drugs, and I can't do that to [Son and Daughter].

Applin concluded her testimony by referring to psychological assessments that characterized Mother as a "questionable parental resource" and Father as a "potentially suitable parental resource."

### B. Mother

Mother testified that she has five children but that she relinquished her rights to Siblings in 2014 when the third was born with "cocaine, marijuana, and methamphetamines in her system." Mother indicated that, at the time, she initially lied to caseworkers about her drug use but called the next day to tell the truth because she "got scared." She testified that she completed a 60-day treatment program following the removal of Siblings and that, between 2014 and the date of trial, she had completed a total of two inpatient programs and two outpatient programs, including the inpatient and outpatient care she received while this case was pending. She also testified that she sees Siblings on a "regular basis," talks to "all three of them every day," and has "never missed a birthday or a holiday."

While testifying, Mother emphasized that until her most recent inpatient treatment, no one had explained to her that she "ha[s] other mental illnesses that [she] ha[s] to fight." Although her testimony on this point was inconsistent, she complained that early in 2020 the Department had obtained a copy of her psychological evaluation, which included diagnoses of major depressive disorder, generalized anxiety disorder, and self-reported borderline personality disorder, among others, but that no one had provided her a copy:

6

I was not given information that would have been helpful. If the actual—if their actual means was to reunite, they would give me everything possible to fight with. . . . [T]hey didn't tell me I had to go to rehab. That's something I chose to do because I want to get help. I want to be a better person. I want to be a better parent.

She then testified that she has scheduled appointments to start receiving the "medicine" and "therapy" she needs, and that, other than while she was in the inpatient facility, she had been regularly attending "narcotics anonymous" meetings and has reconnected with church and family members to build a better support network. She also testified that she has maintained the same job for three years, that she has "always been stable with a job and a place," and that she had recently obtained a driver's license.

When asked how she thinks this case differs from the 2014 case in which she relinquished her rights to her children, Mother responded:

I was a lot younger and young-minded, and I understand now and take ability for my actions, and now I have not only my own relapse prevention plan but I have a better support team, a better support system. I have more outlets that are—that can help me maintain my maintenance [sic] for my addiction because back then I didn't consider myself an addict, and I would rather say I'm in recovery now. And I understand that is going to take more than just saying it or staying home. I have to actually put forth the effort and help with my mental illness . . . .

She summarized her position by saying she is now "being realistic with it."

Mother was not asked about her relationship with or plans for Son or Daughter, but evidence admitted at trial reflects that Mother told the Department she wanted to reunite with her children and that she expressed concern that she would not be afforded an opportunity "to bond" with infant Daughter during the pendency of the case. Department records describe both Son and Daughter as "bonded and attached" to Mother.

7

### C. Father

Father's testimony consisted primarily of a summary of his criminal history and his history of recreational drug use, along with his deep desire for family reunification. He described himself not as a "regular" drug user but as a user only in "party-type situation[s]." He denied that he had ever been in inpatient or outpatieint rehabilitation and said that the "P.A.D.R.E." program that the Department referred him to was not an outpatient drug rehabilitation program—as the Department had characterized it—but was in fact a parenting class. He indicated that, after the cocaine relapse, he decided to pursue outpatient rehabilitation, which would begin a few days after trial, of his own initiative. When asked if he considered himself "an addict," he responded:

> I feel like I might have a problem, and I need to get help because of the consequences not sinking in and—and, you know, but it's just—I'm just trying—I'm trying to get help. I'm trying to better myself. I know that if we better ourselves we can be better people for our children and that's—that's—that's pretty much the bottom line what I'm trying to do.

He admitted that he and Mother did not do themselves "any favors" by using cocaine in February and March. But he said he did not have any doubt that he could "stay sober for [his] kids."

When asked about his relationship with Mother, Father conceded that they were "having some problems with [their] relationship." He explained, "The stress of the case, you know—you know, not being—being without our kids, you know . . . it's taken—it's taking a toll on us." He described the temptation to blame one another for the removal of the children and the cocaine relapse. He testified that he had spoken with a counselor about the problems.

When asked about possible alternate placements for Son and Daughter, Father testified that he had not thought about it because he "had faith that they would come home." He

testified that he and Mother were seeking "additional time to maybe prove that [they] are worthy of a monitored return and [have] a chance to prove that a little bit." He continued by describing himself and Mother as "great people" and "great parents" who want their kids back home.

### D. Rothas

Rothas, as guardian ad litem, testified that she visits Son and Daughter before each court hearing but said she could not recall the last time she visited them. She testified that she did not know the children's wishes are "as far as it relates to their parents." She testified that Son and Daughter have no identified special needs but that Son, at four years of age, still "defecates himself." When asked if Son had seen any professional in "an attempt to diagnose him with anything," Rothas responded that it was a "good question" but did not provide an answer. The district court revisited the question later in Rothas's testimony, asking Rothas the results of the Department's mandatory diagnostic screening for all children over the age of three. When Rothas again indicated that she did not know and that she could not find the results in the record, the district court interrupted:

> I'm going to save you the effort. I think Exhibit 13, page 6 shows that [Son] had a therapy—or her [sic] therapist is a lady named Bridgette Dilworth, was diagnosed with attention deficit hyperactivity disorder, language disorder involving his speech, and then subsequently the child was diagnosed—or I'm sorry—prescribed methylphenidate by a Dr. Raju as indicated from the [screening].

The court followed up by asking if those diagnoses and treatment "sound about right for his behaviors," and Rothas responded that she hesitates to label children so young but that she agreed that "it does sound about right . . . especially the speech."

9

She agreed with counsel's statements that the children had been in their current placement for "two and a half months," that they were "thriving" in the placement, and that the foster family was "still contemplating whether or not they'll be a permanent placement for these kids." She characterized the placement as a "good home" for Son and Daughter until an adoptive family could be found, in the event the foster family decides against adoption. She pointed out that it was the foster family that had taken Son to his screening and were "working on the speech" with the local school district. When asked for her recommendation regarding termination, she testified that her recommendation "aligns with the Department's recommendation" because she served as the guardian ad litem for Siblings in the 2014 case and feels that Son's and Daughter's case is "a carbon copy" of the Siblings' case, which ended in relinquishment and termination.

Counsel asked Rothas if Son and Daughter would remain "in limbo" in the event of termination. She responded in the negative, and then explained:

> We want children to get to permanency as soon as they can. I would suspect that the Department will be asking the foster parents to make a decision one way or the other very shortly, and if the foster parents decide to not be a permanent placement, then they'll do a legal[-]risk search and get the children in a legal[-]risk home.

She later clarified that "quite honestly, in this case, [she] would ask the Department to look for a legal[-]risk home at this time." She closed by testifying that in her opinion termination is in the best interest of the children due to Mother's and Father's "failure to comply" and "using drugs . . . during the pendency of the case," which "shows that they're not able to be safe or appropriate caregivers for these children now or in the future."

10

**E. Judgment**

At the conclusion of trial, the district court announced its findings that termination of Mother's parental rights is in the best interest of the children and that Mother had: (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endanger the physical or emotional well-being of the children, (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangers the physical or emotional well-being of the children, (3) failed to comply with the provisions of a court order specifically establishing the actions necessary for the parent to obtain return of the children, and (4) used a controlled substance in a manner that endangered the health or well-being of the children. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (P), (2). The district court issued a final decree terminating Mother's and Father's parental rights and naming the Department as managing conservator of Son and Daughter. Mother filed timely appeal. Father did not appeal.

### III. STANDARD OF REVIEW

The district court may order termination of the parent-child relationship only "if clear and convincing evidence supports that a parent engaged in one or more of the [statutorily] enumerated grounds for termination and that termination is in the best interest of the child." *See In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam) (citing Tex. Fam. Code § 161.001(b)); *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 697 (Tex. App.—Austin 2019, pet. denied). "Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018). Parental rights have been characterized as "essential," "a basic civil right of man," and "far more precious than property rights." *See Holick v. Smith*,

685 S.W.2d 18, 20 (Tex. 1985) (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)).  They are "perhaps the oldest of the fundamental liberty interests" protected by the United States Constitution.  *See Troxel v. Granville*, 530 U.S. 57, 65 (2000); *E.E. v. Texas Dep't of Fam. & Protective Servs.*, 598 S.W.3d 389, 396 (Tex. App.—Austin 2020, no pet.).  "When the State initiates a parental[-]rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it."  *Santosky v. Kramer*, 455 U.S. 745, 759 (1982).  "Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent."  *Holick*, 685 S.W.2d at 20.  "Because termination of parental rights 'is complete, final, irrevocable and divests for all time' the natural and legal rights between parent and child, a court cannot involuntarily sever that relationship" in absence of "evidence sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'"  *A.C.*, 560 S.W.3d at 630 (quoting Tex. Fam. Code § 101.007 and *Holick*, 685 S.W.2d at 20).  "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *Id*.

"A correspondingly searching standard of appellate review is an essential procedural adjunct." *Id*.  "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id*.  "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id*. at 631.  "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id*.  "In a factual-sufficiency review, the appellate court must consider whether disputed evidence

12

is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id*. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id*.

## IV. DISCUSSION

In her sole issue on appeal, Mother raises two arguments: first, that the evidence is legally insufficient to support the best-interest finding; and second, that the evidence is factually insufficient to support that finding. I disagree with the first assertion but agree with the second.

### A. Best-Interest Standard

"[T]here is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). "And because of the strong presumption in favor of maintaining the parent-child relationship and the due process implications of terminating a parent's rights to her minor child without clear and convincing evidence, 'the best interest standard does not permit termination merely because a child might be better off living elsewhere.'" *In re D.L.W.W.*, 617 S.W.3d 64, 81 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (quoting *In re J.G.S.*, 574 S.W.3d 101, 121–22 (Tex. App.—Houston [1st Dist.] 2019, pet. denied)). "Moreover, termination is not warranted 'without the most solid and substantial reasons.'" *Id*. (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)). "In parental-termination proceedings, [the Department's] burden is not simply to prove that a parent should not have custody of her child; [the Department] must meet the heightened burden to prove, by clear and convincing evidence, that the parent should no longer have any relationship

13

with her child whatsoever." *Id.* (citing *In re K.N.J.*, 583 S.W.3d 813, 827 (Tex. App.—San Antonio 2019, no pet.)).

When deciding the best-interest issue, we consider the factors set forth in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976), which include the children's wishes, the children's emotional and physical needs now and in the future, any emotional or physical danger to the children now and in the future, the parenting abilities of any parties seeking custody, programs available to help those parties, plans for the children by those seeking custody, the stability of the proposed placement, the parent's conduct indicating that the parent-child relationship is improper, and any excuses for the parent's conduct. *See also A.C.*, 560 S.W.3d at 631; *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). It is the burden of the party seeking termination to establish that termination is in the children's best interest. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). The set of factors is not exhaustive, and no single factor is necessarily dispositive of the issue. *See Holley*, 544 S.W.2d at 371–72; *In re A.B.*, 269 S.W.3d 120, 126 (Tex. App.—El Paso 2008, no pet.).

**B. Legal Sufficiency**

When evaluating a legal-sufficiency challenge, we consider all evidence weighing in favor of the disputed finding and any undisputed contrary evidence. *A.C.*, 560 S.W.3d at 630–631. With respect to the risks to and needs of the children and the nature of the parent-child relationship, it is undisputed that Mother's third child and Daughter were both born with traces of illegal substances in their systems. Mother relinquished her rights to Siblings in 2014 due to recalcitrant drug use. She tested positive for cocaine twice late in the pendency of the case, notwithstanding her awareness that drug use might prevent her from reuniting with Son and

Daughter. And Son, at age four, was not yet properly toilet trained. This evidence suggests the parent-child relationship might not have been a proper one, that Son and Daughter might be exposed to danger, and that Mother may not be able to meet their physical or emotional needs. *See, e.g.*, *M.J. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00527-CV, 2021 WL 1045727, at *10 (Tex. App.—Austin Mar. 19, 2021, no pet.) (mem. op.) (toilet training); *In re K.C.F.*, No. 01-13-01078-CV, 2014 WL 2538624, at *14 (Tex. App.—Houston [1st Dist.] June 5, 2014, no pet.) (mem. op.) (habitual drug use); *In re A.C.*, 394 S.W.3d 633, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (drug use during pregnancy); *In re F.A.R.*, No. 11–04–00014–CV, 2005 WL 181719, at *4 (Tex. App.—Eastland Jan. 13, 2005, no pet.) (mem. op.) (explaining that evidence of substance abuse implicates multiple *Holley* factors).

With respect to the stability of the proposed placement and any plans that the placement might have for the children, both the Department and Father characterized the children as "thriving" in the placement. Applin testified that the children had "come a long way" since removal and placement with the current foster family. Rothas testified that the family had arranged Son's developmental screening and had plans for appropriate therapy for the identified developmental delay and behavioral issues. And it is undisputed that the current foster family was, at least at one point, considering adopting the children.

Based on this evidence, a reasonable factfinder could have formed a firm belief or conviction that termination of Mother's rights is in the best interest of Son and Daughter. I therefore agree with the majority's decision to overrule Mother's legal-sufficiency argument.

15

## C. Factual Sufficiency

I disagree with the majority with respect to the factual sufficiency of the evidence to support the best-interest finding. In examining the factual sufficiency of the evidence supporting a challenged finding, we "weigh[ ] disputed evidence contrary to the finding against all the evidence favoring the finding," *see A.C.*, 560 S.W.3d at 631, to determine "whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding," *see id.* If a reasonable factfinder could not have resolved the evidence in favor of the disputed finding, we must reverse. *See S.G. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00085-CV, 2021 WL 3437890, at *10 (Tex. App.—Austin August 6, 2021, no pet. h.) (mem. op.).

### 1. *the children's wishes*

At trial, Rothas conceded that she did not ask Son or Daughter about their wishes with respect to reunification or placement. However, Department records admitted into evidence indicate that Son and Daughter are "bonded and attached" to Mother and Father. That fact, when paired with the fact that the children had experienced four unsuccessful placements in the eleven-month pendency of the case, would support an inference that Son and Daughter might wish to return to Mother and Father rather than wait for the Department to arrange yet another placement. *See A.L.G.A. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00086-CV, 2019 WL 2998587, at *9 (Tex. App.—Austin July 10, 2019, pet. denied) (mem. op.) (construing undisputed evidence that children were "bonded" as evidence of desire to remain in placement).

16

### 2. *the stability of Mother's and Father's home*

Other than the drug use already discussed, at no point during the pendency of the case did the Department or the ad litem express any concerns about Mother's home, a two-bedroom apartment. Department records admitted into evidence reflect that both parents have a history of stable employment, with Mother having held the same job for three years. Mother and Father had been in a committed relationship for six years at intake, with no history of family violence. And while Father does have a history of criminal convictions, there was no evidence of a history of violence, and the convictions and resulting confinement occurred before the birth of Son and Daughter, his only children, thereby minimizing any impact on the children. *See In re R.S.D.*, 446 S.W.3d 816, 822 (Tex. App.—San Antonio 2014, no pet.) (holding evidence of one-time incarceration, under circumstances in which parent had completed parenting classes, insufficient to support finding that termination is in best interest); *In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.) ("[T]he mere fact that an act or omission occurred in the past does not ipso facto prove that termination is currently in the child's best interest."); *In re R.L.*, No. 04-13-00226-CV, 2013 WL 5508381, at *6 (Tex. App.—San Antonio Oct. 2, 2013, no pet.) (mem. op.) ("The best-interest inquiry is a forward-looking determination."); *In re De la Peña*, 999 S.W.2d 521, 532 (Tex. App.—El Paso 1999, no pet.) ("[W]hile [father's] past may not be stellar, it does not and should not preclude him from his parental role . . . ."). In addition, Mother's and Father's proximity to Grandparents allows Son and Daughter to interact with Siblings and provides additional stability for the household.

### 3. *the stability of the proposed placement and plans for that placement*

The Department's conservatorship during the pendency of the case resulted in little or no stability for Son and Daughter. Records admitted into evidence, when combined with the testimony at trial, reveal that Son and Daughter had been placed four times during the nine months between June of 2020 and March of 2021, with two of those being family placements and two being non-familial. At each new placement, the foster family initially expressed interest in adoption or a long-term arrangement before asking the Department to find a new placement.[4] Rothas testified that the current foster family was "still contemplating" whether to adopt Son and Daughter, but Applin had already testified that the family no longer wants to be considered as a possible adoptive home, and Rothas ultimately testified that she would like the Department to begin searching for a legal-risk home immediately.

The Department's final report to the district court indicates that it would seek termination of Mother's and Father's parental rights and placement of Son and Daughter in a legal-risk foster home. Applin conceded at trial that such a home had not been identified and that Son and Daughter had "not yet" been added to the waiting list. When asked how long it would take to find a legal-risk foster home for Son and Daughter, Applin testified that she "can't say" because "it just depends." She did not deny that it could take several months before an appropriate placement is identified. In short, the Department's proposal, as of the date of trial, does not offer any stability for Son and Daughter. *See In re R.W.*, No. 01-11-00023-CV, 2011 WL 2436541, at *13 (Tex. App.—Houston [1st Dist.] June 16, 2011, no pet.) (mem. op.) (observing "children's uncertain future in regard to an adoptive placement" before holding evidence insufficient to support finding that termination is in best interest).

---

[4] Aunt's placement was disrupted when Aunt left Son and Daughter unattended in a car.

18

### 4. *conduct indicating that the parent-child relationship is improper*

As outlined in my legal-sufficiency analysis, the Department presented some evidence that the relationship between Mother and the children might not be proper, including the fact that Mother had used illegal substances during at least two of her five pregnancies and continued to use cocaine after Daughter was born. *See A.C.*, 394 S.W.3d at 642 (holding evidence that mother "regularly used illegal drugs both during her pregnancy with the child and after undergoing a treatment program" to constitute evidence of an improper relationship). In addition, four-year-old son was not yet toilet trained at the time of trial. *See M.J.*, 2021 WL 1045727, at *10. Nevertheless, Father provided contravening evidence, including that he had completed parenting classes, that he was seeking out counseling for the relationship issues that had developed between himself and Mother, that Mother and Father love Son and Daughter very much and want them back home, and that Mother and Father are both committed to making themselves "better people" and "better parents" for the children.

### 5. *any excuses for the parent's conduct*

With respect to any excuses for the inappropriate aspects of Mother's relationship with Son and Daughter, there is evidence that someone had told Mother marijuana was safe to use during pregnancy. On the subject of the 2014 relinquishment of Siblings, she described herself as "too young" at the time to understand the seriousness of illegal drug use or the ramifications of her choices. And with respect to the cocaine relapse in March and April of 2020 while the case was still pending, Mother testified that no one had informed her that she has underlying psychological disorders that need to be addressed along with her addictions. She

testified that she had voluntarily sought out another round of rehabilitation and had set appointments with additional professionals to start addressing those needs.

### 6. *programs available*

Because the Department has not identified a long-term placement for Son or Daughter, the record includes very little evidence of any programs available to support the children's next foster family. Rothas did offer testimony that the foster family's local school district has started offering services to Son to address his speech and behavioral issues. Those services should remain available to anyone that obtains possession of the children. *See* 19 Tex. Admin. Code § 89.63 (2021) (Tex. Educ. Agency, Instructional Arrangements and Settings). Mother testified that, should the children return to her, she would rely on physicians, counselors, her church, her parents, and her in-laws as sources of support.

### 7. *the children's emotional and physical needs and any dangers posed*

In part because Son and Daughter are so young, the record reflects little evidence of their emotional and physical needs. There is some evidence that Son is suffering from certain developmental and behavioral issues. However, it is unclear whether those issues are transient or long term and to what extent those issues might have been caused or exacerbated by removal and repeated placement in unfamiliar homes. *In re A.L.M.*, 300 S.W.3d 914, 925 (Tex. App.—Texarkana 2009, no pet.). And any substance abuse by Mother undermines Son's and Daughter's emotional and physical health and poses a potential danger to them. *See F.A.R.*, 2005 WL 181719, at *4. It is well settled, however, that a child's "paramount" need is prompt, long-term placement in a safe and stable home. *See* Tex. Fam. Code § 263.307(a). Here, Father testified that he had "no doubt" that, with the counseling and rehabilitation he and Mother are

pursuing, they can provide a safe, sober, drug-free long-term home for Son and Daughter. The Department, meanwhile, is unsure of the next placement for Son and Daughter or when such a placement will be available.

### 8. *the parenting abilities of any parties seeking custody*

The parties presented little evidence regarding Mother's and Father's respective parenting abilities. The fact that four-year-old Son was not yet fully toilet trained at the time of trial may serve as some evidence of weak parenting abilities. And the Department admitted into evidence psychological evaluations performed on both Mother and Father. Mother's report included a host of possible psychological diagnoses, some of which may impact her ability to parent, but as our sister court has explained:

> [H]aving the listed disorders and disabilities does not constitute evidence of an unstable or unsafe home. Nor does the existence of the disorders and disabilities constitute evidence of Mother's inability to provide for the children's emotional or physical needs. Even assuming the children's removal from their Mother and each other was not the cause of the listed diagnoses, there was no proof that Mother did not provide for the children's physical and emotional needs, or that she is unable to provide for their needs in the future.

*In re L.C.L.*, 599 S.W.3d 79, 88 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) (en banc). Mother's report included a conclusion that she is a "questionable parental resource." Father's report characterized him as a "potentially suitable parental resource." The reports recommended counseling and therapy for both Mother and Father, and both offered undisputed testimony that they had already sought out that treatment and were continuing to do so.

21

*Conclusion regarding factual sufficiency*

Viewing the evidence in a neutral light and weighing all the evidence under the governing standard, I would conclude the majority of the *Holley* factors militate against the best-interest finding in this case. The Department disagrees, relying heavily on Mother's undisputed history of substance abuse and "instability" to argue that "the evidence allowed the trial court to reasonably form a firm belief or conviction that termination of [Mother]'s parental rights" is in Son's and Daughter's best interest. But while Mother's history of substance abuse "is evidence that weighs in favor of the best-interest finding [and] a factor we carefully consider in reaching our conclusion, we cannot ignore all the other evidence and base our holding solely on evidence of [her] drug use." *In re D.D.M.*, No. 01-18-01033-CV, 2019 WL 2939259, at *8 (Tex. App.—Houston [1st Dist.] July 9, 2019, no pet.) (mem. op.). Instead, in conducting a factual-sufficiency review, we must consider all the evidence relating to the *Holley* factors. *See id.* (citing *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006)).

Here, the undisputed evidence suggests Son and Daughter are bonded to Mother. At trial, Mother and Father testified of a plan to safeguard their own health and keep their children safe. Other than drug use by the parents in March and April, the stability of the home is undisputed, whereas the Department is uncertain of its plans for the children. And both Mother and Father offered undisputed testimony of their diligent efforts to get the help they need to address any issues that might have undermined their ability to parent Son and Daughter in the past.

Perhaps of most concern is the fact that the Department did not attempt to obtain Mother's rehabilitation records and that Son's and Daughter's guardian ad litem—the individual charged by the Legislature with "protecting a child's best interest," *see* Tex. Fam. Code

22

§ 107.005(5), could not answer the most basic questions about the children or their best interest. She could not even recall the last time she had seen Son or Daughter. And while Rothas did inform the district court that she "fe[lt] like [she] need[ed] to address the *Holley* issue," did not discuss the *Holley* factors. She testified that she believes termination of Mother's and Father's parental rights is in Son's and Daughter's best interest; however, conclusory statements such as these are not sufficient to support termination. *See In re B.R.*, 456 S.W.3d 612, 617 (Tex. App.—San Antonio 2015, no pet.) ("[The Department]'s agreement that it was in the children's best interest to terminate appellant's parental rights and it was in their interest to 'move on' was conclusory."); *In re A.H.*, 414 S.W.3d 802, 807 (Tex. App.—San Antonio 2013, no pet.) (holding that "conclusory testimony [regarding best interest], such as the caseworker's, even if uncontradicted[,] does not amount to more than a scintilla of evidence."). Therefore, cognizant of the constitutional concerns related to parental termination, the clear instructions from the Supreme Court of Texas that we strictly scrutinize termination proceedings, the strong presumption that preservation of the parent-child relationship is in the children's best interest, and our obligation to consider all evidence equally, *see L.C.L.*, 599 S.W.3d at 89; *D.D.M.*, 2019 WL 2939259, at *8, I would conclude based on the record before us that a reasonable factfinder could not have formed a sufficiently firm belief or conviction that termination of Mother's parental rights is in the children's best interest. Accordingly, I would hold that the Department failed to meet its burden at trial and would sustain Mother's challenge to the factual sufficiency of the evidence to support the district court's best-interest finding.

## V. CONCLUSION

I respectfully dissent in part from the majority's opinion. I agree that the evidence presented is legally sufficient to support the trial court's best-interest finding, but because the evidence is factually insufficient to support that finding, I would reverse the portion of the district court's decree terminating Mother's rights to her children and remand for a new trial. Because they are not challenged on appeal, I would not reach the provisions of the district court's order terminating Father's rights and appointing the Department as permanent managing conservator of the children. *See* Tex. Fam. Code § 263.404 (outlining findings necessary to support appointment of non-parent managing conservator in absence of termination of parent's rights); *In re J.A.J.*, 243 S.W.3d 611, 615 (Tex. 2007) (holding that challenge to conservatorship "was not subsumed in her challenge of the termination decision" where parent "did not specifically appeal" the conservatorship or related findings).

_____

Edward Smith, Justice

Before Justices Goodwin, Baker, and Smith

Filed: December 15, 2021

24