# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00790-CV

---

### J. G., Appellant

### v.

### Texas Department of Family and Protective Services, Appellee

---

### FROM THE 459TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-21-000779, THE HONORABLE AURORA MARTINEZ-JONES, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

J.G. (Mother) appeals from the trial court's decree terminating her parental rights to her son, Jordan.[1]  *See* Tex. Fam. Code § 161.001(b).  Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's findings and argues that she established an affirmative defense to termination due to an alleged disability and the Department's failure to provide her necessary accommodations therefor.  *See id.* § 161.001(b)(1)(N), (O), (2), (d).  For the following reasons, we affirm the trial court's termination decree.

### BACKGROUND AND SUMMARY OF THE EVIDENCE

In February 2021, the Department filed an original petition in a suit affecting the parent-child relationship (SAPCR) seeking termination of Mother's parental rights and/or

---

[1] For the child's privacy, we will refer to him by an alias and to his family members by their relationships to him or by aliases.  *See* Tex. R. App. P. 9.8.

managing conservatorship of Jordan.[2] In the petition, the Department alleged that temporary orders were necessary for the safety and welfare of Jordan, including the appointment of the Department as the child's temporary managing conservator. Attached to the petition was an Affidavit in Support of Extraordinary Relief in which Department investigator Steven Guillory averred that the Department had taken emergency custody of Jordan due to immediate danger to him caused by Mother's neglectful supervision.

In the affidavit, Guillory represented that then one-year-old Jordan has intensive medical needs, including needing to be fed through a G-tube,[3] and was living in a shelter with Mother at the time, and that two months prior to Jordan's removal the Department received a referral that Mother had been under the influence of marijuana while caring for Jordan. Immediately before Jordan's removal, the Department received a second referral alleging that Mother admitted she had been too intoxicated—from drinking alcohol and using marijuana—to replace Jordan's G-tube, which had fallen out, and had called 911 for assistance. Jordan was transported to the hospital, and EMS would not allow Mother to accompany Jordan in the ambulance due to her level of intoxication. During the investigation of the second referral, Mother admitted that she had been too intoxicated to replace Jordan's feeding tube and that

---

[2] The Department also sought termination of the parental rights of Jordan's unknown father, and the final decree terminated the unknown father's rights after finding that he had not registered with the paternity registry under Family Code Chapter 160 and that the Department had exercised due diligence in determining his identity and location. *See* Tex. Fam. Code § 161.002(b)(2)(A).

[3] A G-tube (also known as a gastric or gastrostomy feeding tube) is a tube inserted through a small incision in the abdomen into the stomach that is used for long-term enteral nutrition. *See Feeding Tube*, *Wikipedia*, https://en.wikipedia.org/wiki/Feeding_tube#Gastric_feeding_ tube (last visited May 19, 2023).

everyone present at the time of the incident was also high and intoxicated, resulting in no sober caregiver being present.

The Department placed Jordan in a medical-needs foster home for the duration of the case. The parties entered into a mediated settlement agreement (MSA) in January 2022, by which they agreed to a statutory extension of the case's deadline and that Mother (1) "shall visit with the child as scheduled by the Department" and "confirm each visit 24 hours in advance"; (2) "shall participate in all drug testing requirements within 24 hours of any such request from the Department"; and (3) "shall attend Marijuana Anonymous and shall provide proof of attendance to the Department," among other stipulations. The trial court rendered an order extending the dismissal date per the parties' agreement and incorporating the provisions of the MSA pertaining to the required actions of Mother.

On May 9, 2022, Mother filed a motion for continuance of that date's scheduled merits hearing, arguing that in March and per court order, she had been evaluated by a psychologist and been diagnosed with "borderline intellectual functioning, with an IQ of 66, well below the cutoff of 70-75 for a diagnosis of Intellectual Disability." In her motion, Mother further argued that—while she had previously made "multiple attempts" to execute an affidavit of relinquishment of parental rights, which were not successful "due to logistical problems"— she recently had "indicated a desire to maintain parental rights." She sought the continuance to afford the parties a chance to again mediate the case. The trial court granted the continuance, authorized mediation, and set trial dates of July 18, 25, and August 1. On May 10, Mother filed her "First Amended Answer and Counter-Petition with Americans with Disabilities Act Claim," in which she raised as an affirmative defense to the (O) ground for termination, *see* Tex. Fam. Code § 161.001(b)(1)(O), that she (1) had been unable to comply with specific provisions of the

3

court order and (2) had made a good-faith effort to comply with the order and that her failure to comply was not attributable to her fault, *see id.* § 161.001(d).  She additionally asserted an affirmative defense under the Americans with Disabilities Act (ADA), *see* 42 U.S.C. § 12102, identifying herself as having "an intellectual disability and mental illness."  She asserted that the Department is required to "make reasonable accommodations to enable [her] meaningful access to services," specifically requiring the following accommodations: "more time to process information; less stressful settings for visitation and meetings; and repeated and simplified explanations for requirements and requests made of her."

Trial to the court commenced August 9, 2022, but—after brief initial testimony by the caseworker—was recessed and continued by the parties' agreement.  Trial recommenced and concluded October 20, 2022.

### *Evidence admitted at trial*

Relevant to the issues on appeal, the trial court admitted into evidence the removal affidavit, several of the court's orders prescribing the actions Mother must take to obtain the return of Jordan, and the parties' MSA.  Three witnesses testified: Department caseworker Shawn Schroeder, Mother, and the foster mother.

Schroeder testified that he became the caseworker for this case in early April 2022 and reviewed the case file, learning about Jordan's current medical condition and needs (he had a G-tube and was recovering from a staph infection) and the reasons for Mother's involvement with the Department.  He explained that, from the December 2020 intake—when Mother and Jordan were staying at a women's shelter and she had been found to be under the influence of marijuana while caring for Jordan—the Department determined there was "Reason

to Believe" the intake allegations and accordingly assigned Mother to FBSS (family-based safety services). The second intake, in February 2021, was based on a report that Mother was at a party with friends, all of whom were intoxicated from alcohol and/or marijuana; that Jordan's G-tube fell out and Mother could not reinsert it; that Mother called 911 to assist with the G-tube; and that the paramedics took Jordan to the hospital but would not allow Mother to ride with them because she was too intoxicated. Mother arrived at the hospital at 6:30 a.m. the next day, in "an altered state," and Jordan "seemed to be underweight." Mother left the hospital at 8:00 a.m., saying she would return at 11:00 a.m., but she did not return, even though Jordan stayed in the hospital for a few weeks and Mother had a visitation with Jordan scheduled during that time. Upon discharge, Jordan was placed with the foster family with whom he remained during the case's pendency—about twenty months. In addition to needing to be fed through his G-tube, Jordan also requires occupational therapy, speech therapy, and physical therapy and regularly sees a general surgeon, a neurologist, an ophthalmologist, a dietician, an infectious-disease specialist, and a GI doctor.

Schroeder testified that after being assigned to this case, he tried to contact Mother by phone and text but did not receive any responses; after further attempts he discovered that the phone number she had provided the Department did not work. Furthermore, he explained that Mother had not "been engaged with" any of her court-ordered services or been in contact with the Department since January 2022. Schroeder explained that although Mother had completed parenting classes, an initial OSAR evaluation (a substance-abuse screening), and IOP (intensive outpatient treatment), she had not completed the court-ordered requirements of providing the Department with proof of attendance at Marijuana Anonymous and being

5

successfully discharged from individual therapy. Mother had also not submitted to required drug or alcohol testing since January 2022.

The trial court's orders required Mother to attend visitations with Jordan as scheduled by the Department, but Mother had attended only eleven of the forty-six scheduled visitations, with the most recent visit occurring in January 2022—about nine months before trial. The visitations were available either virtually or in-person, and although the previous caseworker and Schroeder had offered to transport Mother to in-person visitations, she never accepted the offers or asked for assistance with transportation to her services (to which request Schroeder testified he would have said yes). The trial court's orders required Mother to virtually attend Jordan's specialty doctors' appointments, but Mother had not attended any of them during the pendency of the case. Mother explained to Schroeder that her failure to attend visitations was because she was too busy or that she simply needed to reschedule, without providing a reason; sometimes Mother did not confirm her visitations twenty-four hours in advance, as required, and thus the visitations did not occur.

On "multiple occasions" during Schroeder's tenure as caseworker on this case, Mother had informed him that she wanted to give up Jordan for adoption and relinquish her parental rights. The most recent time she had informed him of such desire was August 5, 2022. Schroeder's communication with Mother ceased for periods of weeks or months because she had changed her phone number but did not inform the Department as required. He had most recently lost contact with Mother in August 2022; contact was reestablished shortly before trial when a visitation with Jordan was scheduled. However, that visitation did not occur because Mother did not confirm it even though Schroeder had informed her of the confirmation requirement.

6

Schroeder testified that the Department is concerned that Mother cannot provide a "safe, stable home" for Jordan and refuses to take drug and alcohol tests—admitting to him that she still smokes marijuana, at least since August 2022 (the last time he spoke with her). He testified that the Department knows Mother suffers from depression and seizures and has an IQ of 66. The Department believed that adoption by a safe and loving family was in Jordan's best interest and stated that the Department would begin the process of finding him an adoptive home if Mother's parental rights were terminated because after that juncture there would be no "ties to anything," making adoption more likely. Although the foster family was not willing to adopt Jordan, they were willing to care for him until he could be adopted. Mother had told Schroeder that she has no family support in Austin to help with raising and caring for Jordan.

Mother testified that this CPS case began as an FBSS case because the supervisor of the shelter where she was staying had smelled marijuana on her, and Mother admitted that she had had marijuana in her possession. She admitted that it was not a good decision to go to the party in February 2021 while she was involved in the FBSS case and knowing that the friend hosting the party "just wanted to get drunk." She testified that Jordan had lost two pounds between a hospital admission in January 2021 and the February incident with his G-tube. Mother admitted that she had not taken any required drug tests during the current calendar year, that the last time she visited Jordan was December 2021, and that the Department offered to transport her to visitations but was unable to assist with transportation to Jordan's doctor appointments. She testified that she had provided the Department with proof of her attendance at Marijuana Anonymous—she had attended about ten meetings in 2021—but could not remember what the proof was. While Mother had previously informed the Department that she wanted Jordan to be adopted, she had changed her mind and wanted him returned to her care.

7

Mother explained why she had stopped submitting to drug and alcohol testing: because the way the Department's "system is set up, it is very harsh on my mental and on my physical" and because the visitations and testing were "breaking me down." She had not been in contact with her caseworker because she was "going through a lot financially, mentally" and was "worried about [her] baby." She had requested that the Department allow her to visit with Jordan outside the Department offices, such as a park or restaurant, but the Department had refused. She explained the reason for requesting a change in visitation location: "So we can be able to grow, get to know each other more," and because the situation is "detrimental" and "heartbreaking" for her.

Describing the visits at Department offices that she attended, Mother stated they "were fun" and that she did not "struggle" during the visits at all. She and Jordan had had "good times" at the visitations, although she noticed that he had "stronger bonds" with the nurse, who would periodically come into the room and "mess up" her connection with Jordan, even though she had wished the nurse would simply stay in the room so that they could talk and she could receive updates on his health. When explaining to Department personnel why she did not like visiting Jordan in Department offices, she told them that "it was just really depressing." Mother described her upbringing, explaining that her mother suffered from schizophrenia, requiring Mother to take care of her own mother from a very young age, which experience led Mother to become a certified nursing assistant.

Mother confirmed that she did not have any family or friend support currently. If Jordan were returned to her care, she would need help taking care of him, including equipment and supplies and nursing assistance. She receives Medicaid, and Jordan receives governmental SSI (Supplemental Security Income) due to his disabilities. Mother believed that if she received

nursing help with Jordan, she would be able to care for him on her own and that the government assistance she received would be sufficient financial support. Mother demonstrated familiarity with Jordan's medical needs and required care up until he was removed but admitted that she was less familiar with his current needs and care because the Department had not been "updating" her.

Mother currently was living in a studio apartment but was working on getting a bigger one. She explained that when Jordan was removed, she had been hanging around friends who were "negative influences" but that she had since removed herself from such people through discipline and building a relationship with God. She admitted to still using marijuana "from time to time" but had not drunk alcohol since her son was removed. Mother explained that marijuana does not impair her ability to be an attentive parent to Jordan and that it, rather, makes her "feel better" and helps with her depression and mood. She would be willing to stop using marijuana, work with a Christian-based therapist, and try medications prescribed by the "right psychiatrist" if her parental rights were not terminated.

Mother testified that it was important that she maintain her parental rights because Jordan is her child and she "deserves" to be his parent and be a "whole family" again and return to their "regular life," now that she no longer has chaotic distractions in her life and that her life and home have become "peaceful." If Mother kept her parental rights, she planned to take Jordan to school, have fun and play outside together, and "get his development going." She explained that she was not currently working because scheduling around Jordan's visitation schedule was too hard, even though she had not visited since December 2021. She briefly worked in June 2022 as a certified nursing assistant but was sexually assaulted by a coworker; after an unsuccessful attempt to resolve the issue with the administrator, Mother decided to

9

leave the position. She testified that she had spoken with a therapist about the sexual assault but could not provide the name of the therapist, explaining that most of her counseling comes from watching videos on YouTube and TikTok.

Jordan's foster mother testified that her home is a "medical primary need home" and that Jordan receives 100 hours of nursing care per week—50 at night and 50 during the day. When Jordan arrived in her home at the start of the case, he did not eat anything by mouth and "laid on his back all the time," using his feet to pick up items rather than his hands. He was quite physically and mentally delayed and was recovering from a staph infection on his hand. In the twenty-one months he had been in her care, he had improved greatly: he was walking, running, trying to eat baby foods, mimicking sounds and trying to speak, and playing with other children. In addition to the nursing care, Jordan spends roughly 100 hours per week in therapy, including speech, physical, and occupational therapy and ECI (early childhood intervention). Jordan has multiple medical specialists he sees regularly, averaging about two appointments per month.

The foster mother described an average day for Jordan in great detail: wake-up time, nap time, and bedtime; feedings and meals; hygiene; therapy; play time; and administration of medications. Several other children live in the home, and Jordan has benefitted greatly from the social interaction and attempting to speak and eat what "everybody is eating." She testified that, although Jordan has extensive medical needs and requires specific caregiving, "anybody can learn" to provide the care, and that it would be important for him to be adopted by a family who would "love and accept him for what he is" so that he can "grow and integrate with a family" earlier in life instead of later. She believed that Jordan could have a "normal life, with proper care" if he continues to receive the services and caregiving that her family and the Department have been providing.

10

**STANDARD OF REVIEW**

To terminate a parent's rights to her child, the Department must prove by clear and convincing evidence that the parent engaged in conduct constituting at least one statutory ground for termination pursuant to Section 161.001 and that termination is in the child's best interest. Tex. Fam. Code § 161.001(b); *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). We defer to the factfinder, who, "having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014).

In legal-sufficiency reviews, appellate courts consider undisputed evidence contrary to the finding at issue but assume that the factfinder resolved disputed facts in favor of the finding. *A.C.*, 560 S.W.3d at 630–31. The evidence is legally sufficient "if, viewing the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* at 631. In contrast, for factual-sufficiency reviews, appellate courts weigh the disputed evidence contrary to the finding against the evidence supporting the finding and ascertain "whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

11

We consider a trial court's finding on best interest in light of the factors set out in *Holley v. Adams*: the child's wishes, if appropriate given the child's age; the child's emotional and physical needs now and in the future; present and future emotional or physical danger posed to the child; the parenting skills of those seeking custody; any programs available to assist those seeking custody to promote the child's best interest; plans for the child's future; the stability of the home or proposed placement; conduct by the parent that might show that the parent-child relationship is inappropriate; and any excuses for the parent's conduct. 544 S.W.2d 367, 371–72 (Tex. 1976). The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence [was] undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

"When considering the child's best interest, we may take into account that a parent is unable to provide adequate care for a child, lacks parenting skills, or exercises poor judgment." *In re M.C.*, 482 S.W.3d 675, 688 (Tex. App.—Texarkana 2016, pet. denied). "Parental drug abuse, which reflects poor judgment, is also a factor that may be considered when determining the child's best interest." *Id.* Additionally, the amount of contact between the parent and child and the parent's past performance as a parent are relevant in determining the child's best interest. *Id.*

12

**DISCUSSION**

*Subsection (O) finding*

In her first issue, Mother contends that the trial court erred in terminating her parental rights under Subsection (b)(1)(O) because she proved all the elements of an affirmative defense under Subsection (d) and under the ADA due to her disability.[4] *See* Tex. Fam. Code § 161.001(b)(1)(O), (d); *C.C.F. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00152-CV, 2020 WL 4929782, at *5 (Tex. App.—Austin Aug. 19, 2020, pet. denied) (mem. op.) (holding that plaintiff who pleads she was unable to comply with court order due to disability must prove by preponderance of evidence her inability to comply, her good-faith effort to comply, and her lack of fault in being unable to comply); *In re B.L.M.*, 114 S.W.3d 641, 649 (Tex. App.—Fort Worth 2003, no pet.) (determining that "ADA complaint is in the nature of an affirmative defense" and that defendant must plead, prove, and secure findings sustaining defense).

---

[4] Within this same issue, Mother appears to also challenge the legal and factual sufficiency of the evidence supporting the following two elements of the trial court's Subsection (O) finding: (1) that Jordan was removed for abuse or neglect and (2) that she failed to comply with the terms of the trial court's orders specifically setting forth the services she must complete to have Jordan returned to her. *See* Tex. Fam. Code § 161.001(b)(1)(O). However, Mother admitted that she did not submit to required drug testing and did not attend visitations or doctor's appointments with Jordan, which—even in the absence of the caseworker's similar testimony—constitutes both legally and factually sufficient evidence supporting the second challenged element. Legally and factually sufficient evidence also supports the first challenged element: the caseworker's testimony about Mother being too intoxicated to replace Jordan's G-tube and having no sober caregiver present; the removal affidavit; and the trial court's finding in prior temporary orders that Jordan's remaining in Mother's care posed a danger to his physical health or safety. *See R.J. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00190-CV, 2022 WL 4281615, at *5 (Tex. App.—Austin Sept. 15, 2022, pet. denied) (mem. op.) (recognizing that trial court may rely on its prior orders and fact findings to support Subsection (O) finding); *A.B. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00593-CV, 2020 WL 560585, at *2–3, 11 (Tex. App.—Austin Feb. 5, 2020, pet. denied) (mem. op.) (noting that trial court may sua sponte take judicial notice of its prior orders and fact findings therein).

Subsection (d) provides,

(d) A court may not order termination under Subsection (b)(1)(O) based on the failure by the parent to comply with a specific provision of a court order if a parent proves by a preponderance of evidence that:

(1) the parent was unable to comply with specific provisions of the court order; and

(2) the parent made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent.

Tex. Fam. Code § 161.001(d).

Simply pleading a Subsection (d) defense is not enough; the parent must establish by a preponderance of the evidence that she was unable to comply, that she made a good-faith effort to comply, and that her failure to comply was not attributable to any fault on her part. *See C.C.F.*, 2020 WL 4929782, at \*5. Although in her counter-petition Mother raised this affirmative defense and asserted that she has a disability, we conclude that there is legally and factually sufficient evidence from which the trial court could reasonably conclude that Mother did not meet her burden of proof on her Subsection (d) defense. *See In re Y.M.L.*, No. 04-19-00168-CV, 2020 WL 1695498, at \*4 (Tex. App.—San Antonio Apr. 8, 2020, pet. denied) (mem. op.).

Mother testified that complying with the required drug testing was "harsh on [her] mental and on [her] physical"; that the visitations were "breaking [her] down"; and that she had asked the Department to change the visitation location because the office setting is "detrimental," "heartbreaking," and "really depressing" to her. However, such descriptions of Mother's attempts to comply with specific provisions of the trial court's orders are not evidence of an *inability* to comply with the orders, whether that inability is allegedly due to disability or to

14

another reason. At most, this evidence might explain why Mother stopped taking drug and alcohol tests and attending visitations after January 2021, but Subsection (d) requires more than an explanation; it requires proving by a preponderance of evidence an inability to comply, as well as that such failure to comply was not due to *any* fault of the parent. *See* Tex. Fam. Code § 161.001(d). Furthermore, although there was some evidence that Mother suffers from depression and seizures and has a low IQ and other unspecified mental-health issues—her alleged disabilities—we cannot say that the evidence establishes by a preponderance that such disabilities rendered her unable to comply with the trial court's orders.

Moreover, as to Mother's contention that the Department failed to make reasonable accommodations for her alleged disabilities—assuming without deciding that Texas recognizes a complaint of lack of compliance with the ADA in termination cases as an affirmative defense—she did not introduce any evidence at trial demonstrating that she requested accommodations from the Department regarding drug testing or that any particular accommodations for that requirement were necessitated by her alleged disabilities. *See In re M.N.M.*, No. 05-14-00723-CV, 2014 WL 6737003, at *12 (Tex. App.—Dallas Dec. 1, 2014, pet. denied) (mem. op.). Although Mother testified that she asked the Department to allow her to have visitations outside of Department offices, she did not explain how such request was linked to any disability but, to the contrary, testified that the office visitations had been fun and that she did not struggle with them. Mother also fails to specify any provision of the ADA that the Department allegedly violated. *See* 42 U.S.C. §§ 12111–12213. We cannot conclude that the trial court erred in failing to find that Mother established either her Subsection (d) or ADA affirmative defense, especially considering that the trial court—as factfinder—is the sole arbiter of the witnesses' credibility and demeanor. *See In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We accordingly affirm the trial court's Subsection (O) finding and need not, therefore, address Mother's second issue challenging the termination of her rights under Subsection (N). *See In re J.W.*, 645 S.W.3d 726, 748 (Tex. 2022).

### *Best-interest finding*

In her third issue, Mother contends that the evidence was legally and factually insufficient to prove that termination was in Jordan's best interest. *See* Tex. Fam. Code § 161.001(b)(2). Because evidence of each *Holley* factor is not required to support a trial court's best-interest finding, *see C.H.*, 89 S.W.3d at 27, we address only those factors on which there is relevant evidence in the record.

Although Jordan was too young to express his desires, the trial court may infer those from the evidence, *see In re K.M.*, No. 07-16-00120-CV, 2016 WL 3660076, at *4 (Tex. App.—Amarillo June 29, 2016, pet. denied) (mem. op.), including the fact that he had spent minimal time with Mother, *see In re S.R.*, 452 S.W.3d 351, 369 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Mother had not visited him for over nine months, a fact which supports the conclusion that there was little emotional bond between the two, *see In re M.B.*, No. 02-15-00128-CV, 2015 WL 4380868, at *15 (Tex. App.—Fort Worth July 16, 2015, no pet.) (mem. op.), despite Mother's testimony that she loves Jordan and would like to maintain her parental rights to him. The lack of an emotional bond between the child and the parent is relevant in determining the child's desires, *In re C.N.S.*, 105 S.W.3d 104, 106 (Tex. App.—Waco 2003, no pet), and Mother testified that—during the eleven times she attended visitation earlier in the case—Jordan demonstrated a stronger bond with the nurse than with her. Additionally, the foster mother testified that Jordan is "very happy" in her home, in which he had lived since he was a

16

little over a year old. Jordan lived with Mother for not much longer than the first year of his life, with some of that in the hospital due to his serious medical conditions.

Regarding Jordan's physical and emotional needs and the danger to him, the evidence showed that Jordan is a medically fragile child with great needs who had been placed in a medical-primary-needs foster home for children with special needs throughout the case. He requires frequent, specific care for his multiple medical and developmental issues, receiving nursing care of 100 hours per week and numerous therapy appointments. Evidence showed that Mother's intoxication leading to the second intake and Jordan's removal rendered her unable to meet his medical needs, which supports an inference that she may be unable to meet his needs again in the future, especially in light of her continued use of marijuana through the case. *See In re J.I.G.*, No. 01-18-00023-CV, 2018 WL 3233874, at *10 (Tex. App.—Houston [1st Dist.] July 3, 2018, no pet.) (mem. op.). Furthermore, Mother's admission to continued marijuana use, knowing her parental rights were in jeopardy, supports the conclusion that she is not willing or able to provide the child with a safe environment—a primary consideration in determining best interest. *In re A.C.*, 394 S.W.3d 633, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.). Mother also testified about her ongoing struggles with depression, for which she self-medicates with marijuana, and the evidence showed that she had a tendency to disregard psychiatric recommendations, indicating that she may not take prescribed medications in the future, which supports an inference that her attitudes towards addressing her mental issues might create a risk of danger to her properly caring for Jordan. *See In re K.P.*, No. 09-13-00404-CV, 2014 WL 4105067, at *15 (Tex. App.—Beaumont Aug. 21, 2014, no pet.) (mem. op.); *In re K.W.*, No. 2-08-162-CV, 2009 WL 417913, at *6 (Tex. App.—Fort Worth Feb. 19, 2009, no pet.) (mem. op.).

Regarding Mother's parental abilities, she admitted that she had not attended any of Jordan's numerous medical appointments, citing lack of transportation, although the court had ordered her to attend virtually. She admitted ignorance of Jordan's present medical needs because of her lack of communication with the Department but conceded that the Department always provided an update on Jordan when she asked. Although Mother completed parenting classes and IOP, she had not visited Jordan in ten months and still smoked marijuana even though she admitted that her "true issue is marijuana" and had not provided documentation of attendance at Marijuana Anonymous. She has unspecified mental-health issues but chooses to self-medicate and watch online counseling videos rather than complete therapy with a personal therapist, and she indicated a reluctance to take prescribed medications. Evidence showed that Mother suffers from depression and seizures and has an IQ of 66. The trial court could reasonably have considered the evidence of Jordan's significant medical needs and Mother's lack of interest in being updated on his well-being and in establishing a bond with him as indicators of her parenting abilities, with limited chances of improvement due to her low cognitive functioning and ill-treated mental health issues. In analyzing a parent's ability to parent, the court may consider the special needs of the child, because the "needier the child, the more able the parent must be." *In re A.L.M.*, 300 S.W.3d 914, 919 (Tex. App.—Texarkana 2009, no pet.). Additionally, although Mother had access to programs to help her address her mental-health and drug issues and was offered transportation for visitations, for the most part she did not avail herself of them.

Stability and permanence are paramount in the upbringing of children. *In re J.D.*, 436 S.W.3d 105, 120 (Tex. App.—Houston [14th Dist.] 2014, no pet. Thus, a factfinder is free to reject a parent's assertions of future stability and of having learned from her mistakes. *In re*

18

*A.M.*, 385 S.W.3d 74, 83 (Tex. App.—Waco 2012, pet. denied). Mother testified only as to vague plans for Jordan were he to be returned to her care, admitting that she did not have any of the supplies or equipment she would need to care for him and that she has no family or friend support. She explained wanting to keep her parental rights because Jordan is her child and she "deserves" to raise him. Yet, Mother had changed her mind about wanting to relinquish her parental rights more than once during pendency of the case, supporting an inference that she may not be able to be a stable presence in Jordan's life. Although Mother testified that she had last drunk alcohol when Jordan was removed, the trial court could have disbelieved her testimony, especially in light of the evidence that she had refused to take required drug and alcohol tests since January 2021. Although the Department had not yet identified an adoptive family for Jordan, Schroeder believed the Department would be able to find such a family after Mother's rights were terminated, and Jordan would be able to remain in the same foster home until such adoption could occur. The Department's plan for a child is not required to be definite prior to termination, *Spencer v. Texas Dep't of Fam. & Protective Servs.*, No. 03-10-00498-CV, 2010 WL 5464110, at *3 (Tex. App.—Austin Dec. 31, 2010, no pet.) (mem. op.), and despite Jordan's significant special needs, the foster mother believed that anyone could learn how to attend to them.

Regarding Mother's acts or omissions and the excuses therefor, we have already noted that Mother continued to use marijuana while caring for her medically fragile child, after an initial intake resulting from her use of the drug and being placed in the FBSS program, and that she continued to use it after her child was removed from her, knowing her parental rights were in jeopardy. She failed to submit to drug and alcohol testing and visit Jordan for over nine

19

months, explaining her failures with vague references to the requirements being physically and mentally harsh and as being due to her "going through a lot" financially and mentally.

Viewing all the evidence in the light most favorable to the trial court's decree, we conclude that a reasonable factfinder could have formed a firm belief or conviction that termination of Mother's parental rights is in Jordan's best interest. After weighing the disputed evidence that is contrary to the best-interest finding against the evidence supporting the best-interest finding, we conclude that the disputed evidence is not so significant that a reasonable factfinder could not have resolved it in favor of the finding. Accordingly, after considering the relevant factors under the appropriate standards of review, we conclude that the evidence is legally and factually sufficient to support the trial court's finding that termination of the parent-child relationship is in Jordan's best interest.

### *Judicial notice*

In her final issue, Mother cites Texas Rule of Evidence 201(e), arguing that in a December 6, 2022 letter ruling, the trial court represented to the parties that it had taken judicial notice of the clerk's file but failed to provide the parties with prior notice of its intent to take judicial notice, which was improper. However, Rule 201 allows a court to take judicial notice sua sponte, without providing parties notice, and expressly provides that if it takes notice before notifying the parties, a party is entitled to be heard afterwards. *See id.* R. 201(c), (e). Mother does not cite anywhere in the record demonstrating that she objected to the trial court's taking judicial notice or requested a hearing on the matter. She therefore has not preserved the issue for our review. *See C.G. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00019-CV, 2022 WL 2069128, at *3 (Tex. App.—Austin June 9, 2022, pet. denied) (mem. op.). Moreover,

20

a trial court may take judicial notice of its own records and of the filings in a case, including its own orders, but may not take judicial notice of the truth of matters alleged therein. *See id.* We find no indication in the record that the trial court took judicial notice of the truth of the facts or allegations in its records. We overrule Mother's final issue.

## CONCLUSION

Having overruled Mother's issues, we affirm the trial court's termination decree.

_____

Thomas J. Baker, Justice

Before Justices Baker, Smith, and Jones[*]

Affirmed

Filed:   May 25, 2023

[*]Before J. Woodfin Jones, Chief Justice (Retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code § 74.003(b).